487 F.2d 1113
 81 L.R.R.M. (BNA) 2257, 159 U.S.App.D.C. 242,
69 Lab.Cas. P 13,017
 INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, AFL-CIO,
and Local 134, International Brotherhood of
Electrical Workers, AFL-CIO, Petitioners,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
BELL SUPERVISORS PROTECTIVE ASSOCIATION (not a labor
organization), Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
 Nos. 71-1559, 71-1785.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued March 9, 1972.
Decided Sept. 22, 1972.
 
 Mr. Laurence J. Cohen, Washington, D. C., and Mr. Robert E. Fitzgerald, Jr., of the bar of the Supreme Court of Illinois, pro hac vice, by special leave of court, for petitioners in No. 71-1559.
 Mr. George B. Christensen, Chicago, Ill., for petitioner in No. 71-1785.
 Mr. Daniel M. Katz, Atty., N. L. R. B., with whom Messrs. Marcel Mallet-Prevost, Asst. Gen. Counsel, and Warren M. Davison, Deputy Asst. Gen. Counsel, N. L. R. B., were on the brief, for respondent.
 Before WRIGHT and MacKINNON, Circuit Judges, and MATTHEWS,* Senior District Judge for the District of Columbia.
 MacKINNON, Circuit Judge:
 
 
 1
 Illinois Bell Telephone Company (hereinafter referred to as the Company or the Employer) and its predecessors have maintained a contractual relationship with Local 134, International Brotherhood of Electrical Workers, AFL-CIO (hereinafter referred to as Local 134) since 1909. Local 134 represents the Company's Chicago workers in the "Plant Department," including not only journeymen and apprentices employed as P.B.X.[1] installers but also persons employed as "P.B.X. Installation Foremen," "Building Cable Foremen," and "General Foremen."[2] Under Article III, Section 1 of the collective bargaining agreement between Local 134 and the Company, which was in effect at all times relevant to the instant case, all members of the bargaining unit, including the abovementioned foremen, were required to become and remain members of Local 134 within thirty days of the commencement of their employment.[3]
 
 
 2
 Between May 8, 1968, and September 20, 1968, Local 134 engaged in an economic strike against the Company. At the inception of this strike, the Company informed the foremen that it would like to have them come to work during the work stoppage, but it told them that the decision whether to work or to respect the strike was a matter left to the personal discretion of each individual foreman. The Employer indicated that those who chose not to work would not be penalized. On the other hand, a Local 134 representative warned the foremen, at a union meeting held immediately before the strike, that they would be subject to union discipline if they performed rank-and-file work[4] during the strike. In response to this warning, several foremen formed the Bell Supervisors Protective Association (hereinafter referred to as the Association), and through it they retained counsel to protect the rights of those foremen who chose to work during the strike. The Association also planned to encourage other Company foremen to report to work during the work stoppage.
 
 
 3
 During the course of the strike, some of the foremen reported to work and performed rank-and-file work, while other foremen chose to honor the strike and stayed away from work. After the strike, the Company in no way discriminated against the latter group, and it indeed promoted some of them to higher positions. Local 134, however, carried out its pre-strike warning and conducted disciplinary proceedings against a number of foremen.[5] Local 134 imposed fines of $500 on each foreman who performed rank-and-file work during the strike, and it imposed fines of $1,000 each on the five foremen who were instrumental in the formation of the Association. Most of the foremen who were fined exercised their right under the constitution of the International Brotherhood of Electrical Workers, AFL-CIO (hereinafter referred to as the International Union) to appeal from the disciplinary action of Local 134-first to the International Union Vice President, and then to the International Union President. The appellants contended that Local 134's imposition of fines upon them was illegal, and they asserted that the contractual union-security provision which required them to be members of Local 134 was similarly unlawful. Of those foremen who appealed, three had their appeals sustained on the ground that the charges against them had not been timely filed. Three others had their appeals disqualified based upon the procedural ground that their appeals were untimely. The other appellants had their disciplinary fines upheld. Local 134 has commenced suit in the Illinois courts to collect some of the fines. Insofar as any of the foremen have paid any part of the fines, the Company has reimbursed them.
 
 
 4
 In June of 1969, the Association filed an unfair labor practice charge with the National Labor Relations Board (Labor Board or N.L.R.B.), alleging that Local 134 and the International Union had violated section 8(b)(1)(B) of the National Labor Relations Act, as amended (N.L.R.A.),[6] by fining the Company foremen because of their performance of rank-and-file work during the 1968 strike and by fining the five foremen who were instrumental in the formation of the Association. A complaint was issued pursuant to this charge, and a hearing relating thereto was held before Trial Examiner Frederick Reel. The first three days of hearings were devoted exclusively to the section 8(b)(1)(B) issue. However, on the afternoon of the fourth and final day of hearings, as the hearings were about to be closed, counsel for the Association offered a motion to amend the complaint "to Conform Pleading [i. e., the complaint] to Proof." The Association indicated that the collective bargaining agreement which contained the union-security provision had been admitted into evidence as part of the section 8(b)(1)(B) case, and it argued that this provision was in clear violation of section 8(a)(3)(i) of the N.L.R.A., since it covered a bargaining unit which included both "employees" and "supervisors."[7]
 
 
 5
 The counsel for the General Counsel of the Labor Board did not join in or consent to the Association's motion to amend the complaint.[8] The Trial Examiner noted that the identical legal contention presented by the Association had previously been rejected by the General Counsel,[9] and he decided that it would not be appropriate to permit such an amendment under the circumstances of the case before him. He noted that "the amendment offered by the [Association] would of necessity add factual allegations to the complaint as well as new [N.L.R.A.] subsections to the list of those violated."[10] The Trial Examiner pointed out that the Association was seeking the invalidation of a contractual provision which had been in existence for many years, and he emphasized the fact that cases which had been recently before the Labor Board itself had involved such union-shop arrangements without evoking any intimation that the Board found anything irregular in them. In finally concluding that it would be "inadvisable" to permit the Association's amendment, the Trial Examiner said that he doubted "the wisdom of deciding so far reaching a question which enters this litigation only by the back door, as it were."[11] The N.L.R.B. sustained this determination.
 
 
 6
 The Labor Board concluded, in agreement with the Trial Examiner, that the Company foremen in question were "supervisors" within the meaning of section 2(11) of the Act,[12] at all times relevant to the case. It also affirmed the determination that such foremen were "Employer representatives" within the meaning of section 8(b)(1)(B) of the Act.[13] The Labor Board finally concurred in the Trial Examiner's conclusion that both unions-Local 134 and the International Union[14]-had restrained and coerced the Company in the selection of its collective bargaining and grievance adjustment representatives, in violation of section 8(b)(1)(B), by disciplining foremen/members for performing rank-and-file work during the 1968 strike and by fining foremen/members because of their action in forming the Association. A cease and desist order was issued, and the two unions were affirmatively ordered to rescind and expunge all records of the fines imposed upon the foremen in violation of section 8(b)(1)(B) of the N.L.R.A.; to reimburse the foremen for any portions of their fines already paid; to advise each such foreman in writing that the fines have been rescinded and that the records pertaining thereto have been expunged; and to post appropriate notices.
 
 
 7
 The two unions and the Association petitioned this court for review of the Labor Board's decision, and the N.L.R.B. filed a cross-application for enforcement of its order. We affirm the decision of the Labor Board insofar as it pertains to the section 8(b)(1)(B) determination and the denial of the Association's request to amend the complaint. However, while enforcement of the Board's remedial order against Local 134 is granted in full, we believe that the remedial order against the International Union must be modified to reflect its proper measure of unfair labor practice responsibility.
 
 
 8
 * Section 8(b)(1)(B) of the N.L.R.A. prohibits union coercion or restraint of an employer "in the selection of his representatives for the purposes of collective bargaining or the adjustment of grievances".[15] This provision, of course, clearly proscribes direct union interference with an employer's selection of his section 8(b)(1)(B) representatives.[16] However, as the Labor Board and several courts, including this one, have recently recognized, it also has much broader application. It prohibits indirect union restraint or coercion of an employer, accomplished through the imposition of discipline upon the employer's representatives for actions performed by them within the general scope of their supervisory or managerial responsibilities. Although the unions involved in the instant case have challenged this latter interpretation of section 8(b)(1)(B) as being an unwarranted extension of the express language of the statutory provision, we must reject this assertion as contrary to the legislative intent of Congress.
 
 A. OAKLAND MAILERS AND ITS PROGENY
 
 9
 In San Francisco-Oakland Mailers' Union No. 18, International Typographical Union, 172 NLRB No. 252, 1968-2 CCH NLRB p20,195 (1968), the N.L.R.B. held illegal union actions which "were designed to change the [employer's] representatives from persons representing the viewpoint of management to persons responsive or subservient to [the union's] will."[17] In reaching the conclusion that the union's imposition of discipline on supervisors because of the manner in which they interpreted and applied the collective bargaining agreement violated section 8(b)(1)(B), the Labor Board noted:
 
 
 10
 In enacting Section 8(b)(1)(B) Congress sought to prevent the very evil involved herein-union interference with an employer's control over its own representatives. That [the union] may have sought the substitution of attitudes rather than persons, and may have exerted its pressure upon the [employer] by indirect rather than direct means, cannot alter the ultimate fact that pressure was exerted here for the purpose of interfering with the [employer's] control over its representatives. Realistically, the Employer would have to replace its foremen or face de facto nonrepresentation by them.[18]
 
 
 11
 More recent Labor Board and court decisions have further applied the doctrine enunciated in Oakland Mailers. In N.L.R.B. v. Toledo Locals Nos. 15-P and 272 of Lithographers and Photo-Engravers International Union, 437 F.2d 55 (6th Cir. 1971), wherein the court upheld the Labor Board's finding of a section 8(b)(1)(B) violation, the Sixth Circuit stated:
 
 
 12
 This conduct of the union could very well be considered as an endeavor to apply pressure on the supervisory employees of the [employer], and to interfere with the performance of the duties which the employer required them to perform * * * and to influence them to take action which it, the employer, might deem detrimental to its best interests. This conduct of the union would further operate to make the [supervisory] employees reluctant in the future to take a position adverse to the union, and their usefulness to their employer would thereby be impaired.
 
 
 13
 437 F.2d at 57 (emphasis supplied). See New Mexico District Council of Carpenters and Joiners of America, 177 NLRB 500, 502 (1969), enfd., 67 L.C. p 12,403 (10th Cir. 1972); N.L.R.B. v. Sheet Metal Workers Intern. Ass'n, Local 49, A.F.L.-C.I.O., 430 F.2d 1348, 1349-1350 (10th Cir. 1970); Local Union No. 2150, International Brotherhood of Electrical Workers, 192 NLRB No. 16, slip op. at 5-6 and cases cited n. 5, 1971 CCH NLRB p23,280 (1971).
 
 
 14
 This court has also recognized the fact that the imposition of fines upon supervisory employees may coerce or restrain their employer in the effective selection of his representatives within the meaning of section 8(b)(1)(B). See Dallas Mailers Union, Local 143 v. N.L.R.B., 144 U.S.App.D.C. 254, 259, 445 F.2d 730, 735 (1971). Although we did not expressly evaluate the propriety of the legal rationale underlying the Oakland Mailers' line of cases in our Dallas Mailers opinion, we implicity recognized its correctness. However, in our subsequent Meat Cutters opinion,[19] we gave our express approval to the decisions which had interpreted section 8(b)(1)(B) as prohibiting union discipline of supervisory personnel for acts performed by them in the course of their supervisory or managerial duties.[20] Our conclusion was based upon the intention of Congress as expressed in the legislative history surrounding the enactment of section 8(b)(1)(B) in 1947.
 
 
 15
 The Supreme Court has recognized the fact "that labor legislation is peculiarly the product of legislative compromise of strongly held views, Local 1976, United Broth. of Carpenters & Joiners of America [A.F.L.] Union v. National Labor Relations Board, 357 U.S. 93, 99-100, 78 S.Ct. 1011, 1016-1017, 2 L.Ed.2d 1186, and that legislative history may not be disregarded merely because it is arguable that a provision may unambiguously embrace [or not embrace] conduct called in question. National Woodworkers Mfrs. Assn. v. N.L.R.B., 386 U.S. 612, 619-620, 87 S.Ct. 1250, 1266, 18 L.Ed.2d 357."[21] When Congress was considering amendments to the National Labor Relations Act in 1947, it was acutely aware of the fact that unions had previously "taken it upon themselves to say that management should not appoint any representative who [was] too strict with the membership of the union," and through the enactment of section 8(b)(1)(B) it endeavored "to prescribe a remedy in order to prevent such interferences."[22] Although this fact is highly pertinent to our evaluation of the proper scope of section 8(b)(1)(B), other legislative history surrounding the 1947 amendments must also be considered.
 
 
 16
 Section 8(b)(1)(B) must not be examined in a vacuum. It must instead be interpreted in conjunction with the other 1947 amendments to the N.L.R.A. relating to supervisory personnel.[23] The fact that Congress decided to expressly exclude "supervisors" from the statutory definition of "employee" in section 2(3)[24] is highly informative.
 
 
 17
 Congress was aware of the potential conflict between the obligations of foremen as representatives of their employers, on the one hand, and as union members, on the other. Section 2(3) evidences its intent to make the obligations to the employer paramount. That provision excepts foremen from the protection of the Act. Its purpose was to give the employer a free hand to discharge foremen as a means of ensuring their undivided loyalty, in spite of any union obligations. See H.Rep. No. 245, 80th Cong., 1st Sess. 14-17 (1947); S.Rep.No.105, 80th Cong., 1st Sess. 3-5 (1947); L.A. Young Spring & Wire Corp. v. National Labor Relations Board, 1947, 82 U.S.App.D.C. 327, 163 F.2d 905, certiorari denied 1948, 333 U.S. 837, 68 S.Ct. 607, 92 L.Ed. 1121 * * *[25]
 
 
 18
 In Meat Cutters, we considered this prior analysis of the 1947 legislative history and concluded that "[a] supervisor's obligations to his union simply cannot detract from the absolute duty, evidenced by section 8(b)(1)(B), which he owes to his employer when exercising his managerial authority."[26]
 
 
 19
 To ensure the accomplishment of the clear intention of Congress when it enacted section 8(b)(1)(B), that provision must not be interpreted in a hypertechnical manner. To construe that section as only applying to union discipline of a supervisor based upon his actions on behalf of management regarding a specific disagreement with the union over the proper interpretation of the collective bargaining agreement or the adjustment of a particular grievance, would defeat the reasons underlying Congress' enactment of section 8(b)(1)(B). When a supervisor is disciplined by a union because of the manner in which he exercised his supervisory or managerial authority-whether or not he was applying a contract provision or adjusting a grievance-that disciplinary action necessarily impinges upon the supervisor's loyalty to his employer, thereby effectively depriving the employer of the undivided loyalty which he has the right to expect under section 8(b)(1)(B). The fact that in such a situation the union "may [seek] the substitution of attitudes rather than persons, and may [exert] its pressure upon the [employer] by indirect rather than direct means, cannot alter the ultimate fact that pressure [is] exerted * * * for the purpose of interfering with the [employer's] control over its representatives * * * [and it realistically will] have to replace its foremen or face de facto nonrepresentation by them."[27] It is therefore intuitively obvious that if the principles underlying the Congressional enactment of section 8(b)(1)(B) are to be given full effect, such conduct by a union cannot be permitted, as the National Labor Relations Board has properly recognized.[28]
 
 
 20
 The fact that section 14(a) of the N.L.R.A.[29] permits supervisors to be union members does not detract from the undivided loyalty they owe to their employer under section 8(b)(1)(B) when they are engaged in supervisory or managerial endeavors. See Meat Cutters Union Local 81 of Amalgamated Meat Cutters and Butcher Workmen of North America v. N.L.R.B., 147 U.S.App.D.C. 375, 380-381, 458 F.2d 794, 799-800 (1972). Similarly, the fact that an employer may have consented to the compulsory union membership of his supervisors under an appropriate unionsecurity provision does not negate his right to the full protection of section 8(b)(1)(B). See Toledo Locals Nos. 15-P and 272 of the Lithographers and Photo-Engravers International Union, 175 NLRB 1072, 1080 (1969), enfd., 437 F.2d 55 (6th Cir. 1971); Local Union No. 2150, International Brotherhood of Electrical Workers, 192 NLRB No. 16, slip op. at 5, 1971 CCH NLRB p23,280 (1971).
 
 B. EFFECT OF ALLIS-CHALMERS AND SCOFIELD
 
 21
 In our previous Meat Cutters decision, we briefly explained why the rationale underlying the Supreme Court's decisions in Allis-Chalmers[30] and Scofield[31] does not relieve a union from responsibility under section 8(b)(1)(B) where it imposes disciplinary fines upon supervisor/members because of supervisory or managerial acts performed by them.[32] However, due to the close factual similarity between the instant case and the Allis-Chalmers situation, we believe that an expanded analysis here would be beneficial.
 
 
 22
 In Allis-Chalmers and Scofield, the Supreme Court sanctioned the imposition of fines by unions on employees-not supervisors-who had violated valid union rules. However, those cases, unlike the present one, concerned the scope of section 8(b)(1)(A) of the Act,[33] not section 8(b)(1)(B), with which we are herein concerned. In upholding the union fines in Allis-Chalmers and Scofield, while the Supreme Court did not rely upon the express language of the proviso to section 8(b)(1)(A), as the Labor Board had originally done in Minneapolis Star and Tribune Co., 109 NLRB 727 (1954), it did draw "cogent support" for its decision from it.[34] See N.L.R.B. v. Allis-Chalmers Mfg. Co., 388 U.S. 175, 191-192, 87 S.Ct. 2001, 18 L.Ed.2d 1123 (1967); Scofield v. N.L.R.B., 394 U.S. 423, 428, 89 S.Ct. 1154, 22 L.Ed.2d 385 (1969). See also Gould, Some Limitations Upon Union Discipline Under the National Labor Relations Act: The Radiations of Allis-Chalmers, 1970 Duke L.J. 1067, 1128 (1970). The applicability of that proviso is, however, clearly limited to section 8(b)(1)(A), which regulates the union-employee relationship. It is not a part of section 8(b)(1)(B), which directly regulates only the union-employer relationship.[35] Although reliance upon the proviso may not have been critical to the Supreme Court's decisions in Allis-Chalmers and Scofield, the fact that it does not have any application in section 8(b)(1)(B) cases indicates that the rationale underlying those two Supreme Court decisions is not apposite with respect to cases, such as the instant one, which involve the disciplining, by unions, of "supervisors" instead of "employees." Furthermore, a closer evaluation of the Allis-Chalmers and Scofield decisions clearly demonstrates that the reasoning of those opinions is not applicable with respect to section 8(b)(1)(B) cases.
 
 
 23
 Under the reasoning of Allis-Chalmers and Scofield, only legitimate internal union affairs are protected. See N.L.R.B. v. Allis-Chalmers Mfg. Co., 388 U.S. 175, 185-187, 195, 87 S.Ct. 2001, 18 L.Ed.2d 1123 (1967); Scofield v. N.L.R.B., 394 U.S. 423, 428, 89 S.Ct. 1154, 22 L.Ed.2d 385 (1969).[36] Those cases primarily concerned the relationship between the unions and their employee/members, and the Court concluded that the union discipline had no improper effect on parties external to that relationship. However, when a union imposes discipline upon a supervisor/member for acts performed by him in furtherance of his supervisory or managerial duties, external relationships which are not protected by the rationale underlying Allis-Chalmers and Scofield are affected.[37] The supervisor-employer relationship is impermissibly affected in an adverse manner, through the union's subversion of the undivided loyalty owed by the supervisor to his employer when he is properly acting to further the interests of his employer. The union also improperly affects the union-employer relationship in a meaningful way. Instead of directly dealing with the employer over the managerial "position" which is displeasing to it, the union attempts to force the acceptance of its view upon the employer indirectly, through the imposition of union discipline upon the employer's chosen representative. Such external ramifications of the union's actions clearly transcend anything protected by the Supreme Court in either Allis-Chalmers or Scofield.[38]
 
 
 24
 Supreme Court decisions issued subsequent to Allis-Chalmers have made it expressly clear that the Allis-Chalmers rationale only permits "a union * * * to enforce a properly adopted rule which reflects a legitimate union interest [and] impairs no policy Congress has imbedded in the labor laws * * *" Scofield v. N.L.R.B., 394 U.S. 423, 430, 89 S.Ct. 1154, 1158, 22 L.Ed.2d 385 (1969) (emphasis supplied), and see 394 U.S. at 429, 432, 89 S.Ct. 1154. See N.L.R.B. v. Industrial Union of Marine & Shipbuilding Workers, 391 U.S. 418, 88 S.Ct. 1717, 20 L.Ed.2d 706 (1968); Booster Lodge No. 405, International Association of Machinists and Aerospace Workers v. N.L.R.B., 148 U.S.App.D.C. 119, 126, 459 F.2d 1143, 1150.[39] Section 8(b)(1)(B) of the Act expresses a clear Congressional policy aimed at affording employers protection against union interference with their chosen representatives. Whenever union action has the effect of impermissibly inhibiting an employer with respect to his choice of loyal representatives, it is apparent that an express federal labor policy is being violated, and it necessarily follows that the rationale underlying Allis-Chalmers and Scofield cannot be availed upon to nullify the clear section 8(b)(1)(B) violation.[40]
 
 II
 
 25
 Having discussed the general principles which apply to section 8(b)(1)(B) cases such as the instant one, and the applicability of the Allis-Chalmers and Scofield reasoning to section 8(b)(1)(B) situations, we turn to an evaluation of the Labor Board's analysis of the particular facts of this case. We first consider the union fines which were imposed upon the supervisor/members who performed rank-and-file work during the economic strike, and secondly consider the disciplinary action which was taken against those supervisor/members who were instrumental in the formation of the Association.
 
 
 26
 A. SUPERVISORS WHO PERFORMED RANK-AND-FILE WORK DURING STRIKE
 
 
 27
 Although the Employer did not require his supervisors to report to work during the 1968 strike, the Company made it very clear that it wanted them to perform rank-and-file work in place of the striking employees. However, despite the fact that the Company took action to allow its supervisory personnel to exercise their own personal discretion in this matter, Local 134 sought to prevent this by threatening the imposition of discipline on any supervisor/member who decided to further the interests of his Employer by acceding to the request of the Company and performing rank-and-file work during the work stoppage. When Local 134's threats were not sufficient to deter some of the supervisors from honoring the request of their Employer, the union imposed fines of $500 on each.
 
 
 28
 The Labor Board correctly recognized that the disciplinary actions taken by Local 134 were a direct result of the fact that those supervisors who reported to work during the strike placed the interests of their Employer above those of their union. It further emphasized the fact that actions of Local 134 "were designed to change the [Company's] representatives from persons representing the viewpoint of management to persons responsive or subservient to [Local 134's] will."[41] The Board concluded that under the reasoning of Oakland Mailers and its progeny, such conduct contravened the principles enunciated in section 8(b)(1)(B) of the Act. We agree.
 
 
 29
 The underlying dispute giving rise to the imposition of the penalties in question was directly between the union and the Company-not between the union and the supervisor/members. Local 134 called the strike to encourage a collective bargaining settlement favorable to it. Although the union had the right to insist upon the loyalty of those employee/members who were in the bargaining unit covered by the strike,[42] the Company also had the legitimate right under the N.L.R.A. to call upon the undivided loyalty of its representatives.[43] This latter statutory right of the Employer was particularly apropos in the instant case, due to the strike situation.
 
 
 30
 It is well recognized that "the use of economic pressure by the parties to a labor dispute is not a grudging exception to some policy of completely academic discussion enjoined by the Act; it is part and parcel of the process of collective bargaining." N.L.R.B. v. Insurance Agents International Union, 361 U.S. 477, 495, 80 S.Ct. 419, 430, 4 L.Ed.2d 454 (1960) (emphasis supplied). It is readily apparent, therefore, that when supervisors' actions during an economic strike further the interests of their employer, they are performing in a manner which could reasonably be expected from such persons. See Local Union No. 2150, International Brotherhood of Electrical Workers, 192 NLRB No. 16, 1971 CCH NLRB p23,280 (1971). See also Texas Co. v. N.L.R.B., 198 F.2d 540 (9th Cir. 1952). As management representatives, supervisory personnel may be requested by management to enhance the bargaining position of their employer during a dispute between it and the particular union involved. Yet this is the precise activity for which the supervisors in question were disciplined by Local 134.[44] Under these circumstances, since they were clearly punished for actions undertaken by them as representatives of their Employer within the meaning of section 8(b)(1)(B),[45] and in accordance with the Employer's express wishes, it logically follows that the disciplining union thereby violated section 8(b)(1)(B) of the Act.
 
 
 31
 The Union's fining of the supervisors who were acting in the Employer's interest in performing the struck work severely jeopardized the relationship between the Employer and its supervisors. Thus, the fines, if found to be lawful, would now permit the Union to drive a wedge between a supervisor and the Employer, thus interfering with the performance of the duties the Employer had a right to expect the supervisor to perform. The Employer could no longer count on the complete and undivided loyalty of those it had selected to act as its collective bargaining agents or to act for it in adjusting grievances.[46]
 
 
 32
 The two unions argue that the Labor Board erroneously concluded that the Employer was "restrained or coerced," within the meaning of section 8(b)(1)(B), by Local 134's imposition of disciplinary fines, on the theory that the Company did not require its supervisors to perform rank-and-file work during the strike. However, this contention overlooks the fact that the Employer clearly expressed his desire by requesting (without ordering) the supervisors to perform such work in furtherance of the Company's bargaining interest. It also ignores the possible detrimental effects which such disciplinary action might have upon the future relationship between the Employer and its supervisors. It is also contrary to the well settled judicial decisions interpreting the meaning of "restraint or coercion."
 
 
 33
 "[I]n determining whether a Sec. 8(a)(1) or Sec. 8(b)(1) violation has been committed, the answer does not 'turn on * * * whether the coercion succeeded or failed * * * the test is whether the employer [Union] engaged in conduct which, it may be reasonably said, tend[ed] to interfere with the free exercise of [the rights protected] under the Act.' N.L.R.B. v. Illinois Tool Works, [7 Cir.,] 153 F.2d 811, 814 * * *" Local Union No. 167, Progressive Mine Workers of America v. N.L.R.B., 422 F.2d 538, 542 (7th Cir.), cert. denied, 399 U.S. 905, 90 S.Ct. 2198, 26 L.Ed.2d 560 (1970). See Meat Cutters Union Local 81 of Amalgamated Meat Cutters and Butcher Workmen of North America v. N.L.R.B., 147 U.S.App.D.C. 375, 382, 458 F.2d 794, 801 n.20. The fact that the Labor Board did not examine the subjective effect upon the Employer of the union discipline with respect to each supervisor does not detract from its conclusion that the disciplinary action was illegal, since the Board reasonably determined that such action meaningfully detracted from the undivided loyalty owed by the supervisors to their Employer. See N.L.R.B. v. Gissel Packing Co., 395 U.S. 575, 608, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969); Radio Officers' Union, etc. v. N.L.R.B., 347 U.S. 17, 51, 74 S.Ct. 323, 98 L.Ed. 455 (1954); N.L.R.B. v. Donnelly Garment Co., 330 U.S. 219, 231, 67 S.Ct. 756, 91 L.Ed. 854 (1947). We find substantial evidence in the record considered as a whole to support this Labor conclusion.[47]
 
 B. SUPERVISORS WHO FORMED THE ASSOCIATION
 
 34
 We believe that the Labor Board properly determined that the fining of those supervisors who participated in the formation of the Association constituted a separate section 8(b)(1)(B) violation. The Board resolved this issue in the following manner:
 
 
 35
 [T]he Bell Supervisors Protective Association arose out of relations among the supervisors, the Company, and the Union, and not * * * out of relations solely between the supervisors and the Union. The Association was formed because the Union threatened to fine supervisors for working during the strike, and to protect or aid those who desired to work. As the Association had its inception as a response to what is here found to be illegal union conduct, it is not unreasonable to extend the finding of illegality to cover the Union's fines relating to the Association. Although the Company was not a party to the creation of the Association, the relationship of the supervisors to the Company underl[ay] the creation of the Association just as it underl[ay] the action of the supervisors in working during the strike. To separate the two sets of fines would be highly legalistic and unrealistic, a practice on which the Board has properly frowned on past occasions, prefering [sic] to treat situations "as a whole."[48]
 
 
 36
 "[W]here the question is one of specific application of a broad statutory term in a proceeding in which the agency administering the statute must determine it initially, the reviewing court's function is limited. * * * [T]he Board's determination * * * is to be accepted if it has 'warrant in the record' and a reasonable basis in law." N. L. R. B. v. Hearst Publications, Inc., 322 U.S. 111, 131, 64 S.Ct. 851, 860, 88 L.Ed. 1170 (1944). We believe that the Labor Board's treatment of this issue not only comports with the general principles underlying section 8(b)(1)(B),[49] but that it represents the only reasonable manner of resolving the problem. Were the Board to have permitted the union to discipline those supervisors who formed the Association, it would have subverted much of the protective effect provided the Employer by its determination that section 8(b)(1)(B) was violated by the imposition of fines upon those foremen who performed rank-and-file work during the strike. The formation of the Association was part and parcel of the supervisors' efforts to further the bargaining interests of their Employer during the work stoppage. It had its primary genesis in the illegal position of Local 134 regarding the performance of struck work by the Employer's representatives,[50] and, as the Labor Board properly recognized, it would have been wholly irrational for it to ignore this important causative connection. We therefore affirm this aspect of the N.L.R.B.'s decision.
 
 III
 
 37
 The Labor Board wholly adopted the Trial Examiner's determination that the International Union violated section 8(b)(1)(B) of the N.L.R.A., due to its affirmance, on appeal, of Local 134's disciplinary actions.[51] Since the International Union furthered the coercion and restraint concomitant with Local 134's unlawful conduct (1) by affirming the imposition of the fines despite claims of illegality specifically raised by the appealing supervisor/members and (2) by retaining records of these adverse measures which might, in the future, inhibit the performance of supervisory and managerial functions by foremen in accordance with the undivided loyalty owed by them to their Employer,[52] we affirm this Board conclusion.
 
 
 38
 To rectify the effects of the unfair labor practice, the Labor Board issued the usual cease and desist order, and it affirmatively required both unions (1) to rescind the illegally imposed fines and expunge all records pertaining thereto; (2) to provide separate written notices for each disciplined supervisor; and (3) to reimburse the foremen for any fines already paid by them. However, with respect to the individual written notice requirement and the provision concerning the reimbursement of already collected fines, the Board only imposed secondary responsibility upon the International Union, with Local 134 being held primarily responsible.
 
 
 39
 It is clear that the Board's entire remedial order concerning Local 134 is within the broad remedial discretion which it is granted under section 10(c) of the Act.[53] We also believe that the Labor Board's order is wholly appropriate to the extent that it requires the International Union to cease and desist from its unlawful conduct, to rescind all of the illegal fines and expunge all records pertaining thereto, and to ensure that individual written notices are provided each disciplined foreman.[54] However, we are unable to agree with the Board's imposition of monetary liability upon the International Union for the fines which have already been collected by Local 134.
 
 
 40
 All of the union disciplinary charges concerning the improperly fined supervisors were brought at the Local 134 level. The disciplinary fines were similarly imposed at the Local 134 level, and only Local 134 has sought to collect them. The International Union's sole action with respect to the fines imposed by Local 134 consisted of its affirmance of them on appeal.[55] Since there is no evidence indicating that the International Union did not exercise good faith when it reviewed Local 134's conduct on appeal, we find that the portion of the Labor Board's remedial order imposing monetary liability on the International Union with respect to the fines already collected by Local 134, was improperly adjudged and cannot be enforced.
 
 
 41
 The International Union should only be held liable for the illegal fines collected by Local 134, if the local union acted as its agent. "In determining whether any person [was] acting as an 'agent' of another person so as to make such other person responsible for his acts, the question of whether the specific acts performed were actually authorized or subsequently ratified shall not be controlling."[56]
 
 
 42
 This section [Sec. 2(13)] was enacted to eliminate the strict requirement for proof of authorization and ratification which the Supreme Court read into a somewhat comparable section of the Norris-LaGuardia Act in United Brotherhood of Carpenters and Joiners of America v. United States, 1947, 330 U.S. 395, 67 S.Ct. 775, 91 L.Ed. 973 * * * But the legislative history of Sec. 2(13) makes plain that Congress intended to do no more than to restore the applicability of common law agency principles of responsibility * * *.
 
 
 43
 International Ladies Garment Workers Union v. N. L. R. B., 99 U.S.App.D.C. 64, 70, 237 F.2d 545, 551 (1956) (emphasis supplied). See Sheet Metal Workers' International Association, A. F. L.-C. I. O., v. N. L. R. B., 110 U.S.App.D.C. 302, 309, 293 F.2d 141, 148, cert. denied, 368 U.S. 896, 82 S.Ct. 172, 7 L.Ed.2d 92 (1961).[57]
 
 
 44
 Where the only action taken by a national or international union is in the nature of an appellate review of the action of a local union, and the national or international union exercises its appellate function in good faith and in the absence of fraud, the national or international union should not be held answerable in damages to a member who was wrongfully disciplined by the local union. See Annotation, 74 A.L.R.2d 783, 800 (1960); Schouten v. Alpine, 215 N.Y. 225, 109 N.E. 244, 246 (1915). See also Madden v. Atkins, 4 N.Y.2d 283, 174 N.Y.S.2d 633, 151 N.E.2d 73 (1958). Since there is no claim that the International Union in the instant case did not exercise its review function in good faith and in the absence of fraud,[58] we believe that the Labor Board improperly imposed monetary liability upon it.[59] We therefore deny enforcement to that portion of the Labor Board's remedial order which imposes monetary liability upon the International Union with respect to the illegal disciplinary fines already collected by Local 134, believing that under the particular facts of this case, the imposition of such liability would not meaningfully effectuate the policies of the N.L.R.A.[60] However, in all other respects, the remedial order of the Labor Board is enforced in full.
 
 IV
 
 45
 The Association has challenged that portion of the Labor Board's decision which upheld the Trial Examiner's refusal to permit the Association to amend the complaint on the last day of the unfair labor practice hearings, to include the allegation that the Company-Local 134 union-security agreement was in violation of section 8(a)(3)(i) of the Act.[61] We must reject this contention.
 
 
 46
 In May of 1968, the Association filed an unfair labor practice charge with the appropriate regional office of the N.L.R.B., contending that the union-security provision in the collective bargaining agreement between Local 134 and the Company was illegal under section 8(a)(3)(i) of the Act, since it covered a unit which included both supervisors and rank-and-file employees. The Regional Director refused to issue a complaint relating to the Association's charge, and the General Counsel of the Labor Board upheld that decision on appeal.[62] On June 10, 1969, the instant section 8(b)(1)(B) case was instituted by the Association. However, neither its charge nor the complaint which was issued pursuant thereto, referred in any manner to the legality of the union-security provision. It was not until the afternoon of the fourth and final day of the hearings before Trial Examiner Reel, that the Association raised this issue with respect to the section 8(b)(1)(B) proceedings. It noted that the collective bargaining agreement containing the challenged provision had already been admitted into evidence, and it argued that the Trial Examiner should resolve the question concerning the provision's legality. The counsel for the General Counsel did not join in, or even consent to, the Association's motion to amend the complaint. The Trial Examiner noted the fact that the General Counsel had previously refused to issue a complaint concerning the legal issue raised by the proposed amendment,[63] and he concluded that it would not be appropriate or advisable to permit such a "far reaching question" to enter the present litigation through the "back door."[64] The Labor Board fully adopted this determination.
 
 
 47
 In refusing to permit the Association's requested amendment, the Trial Examiner assumed that he possessed the authority under section 10(b) of the Act[65] to permit such an amendment. Without intimating any view concerning the correctness of this assumptive interpretation,[66] we affirm the decision of the Labor Board, because we do not believe that its determination concerning the proposed amendment can reasonably be considered to be an abuse of discretion.[67]
 
 
 48
 [The Association's proposed amendment] encompasse[d] charges identical to those [it had previously] filed with the General Counsel; the General Counsel [had] refused to issue a complaint. We would not entertain a frontal attempt to review the General Counsel's decision, Retail Store Employees Union, Local 954, [Retail Clerks Intern. Ass'n, A. F. L.-C. I. O.] v. Rothman, 112 U.S.App.D.C. 2, 4, 298 F.2d 330, 332 (1962), and have not been convinced to review [it] here, through the back door.
 
 
 49
 Retail Clerks Union 1059, R. C. I. A., A. F. L.-C. I. O. v. N. L. R. B., 121 U.S.App.D.C. 140, 141 n.1, 348 F.2d 369, 370 n.1 (1965). See International Union of Electrical, Radio and Machine Workers, A. F. L.-C. I. O. v. N. L. R. B., 110 U.S.App.D.C. 91, 94-96, 289 F.2d 757, 760-762 (1960).
 
 
 50
 This is certainly not a case where the Labor Board has refused to decide a material issue which was fairly tried by the parties. See American Boiler Manufacturers Association v. N. L. R. B., 366 F.2d 815, 821 (8th Cir. 1966). See also Frito Co., Western Division v. N. L. R. B., 330 F.2d 458, 465 (9th Cir. 1964); American Boiler Manufacturers Association v. N. L. R. B., 404 F.2d 547, 556 (8th Cir. 1968), cert. denied, 398 U.S. 960, 90 S.Ct. 2162, 26 L.Ed.2d 546 (1970). The union-security provision in question was only admitted into evidence as part of the applicable collective bargaining agreement. There was no indication, until the end of the proceedings, that its legality was sought to be in issue. The entire unfair labor practice hearings concerned solely the section 8(b)(1)(B) case. Furthermore, we do not believe that the resolution of the question raised by the Association's proposed amendment to the section 8(b)(1)(B) complaint would have been as straightforward as it now asserts. Cf. Nassau and Suffolk Contractors Association, Inc., 118 NLRB 174, 181 n.23 (1957). Under these circumstances, we are unable to conclude that the Trial Examiner abused any discretion which he might have possessed,[68] and we therefore affirm the refusal of the Labor Board to permit the Association's proffered amendment to the complaint.[69]
 
 
 51
 The decision of the Labor Board is affirmed in its entirety, and enforcement of its remedial order, as modified by this opinion with respect to the monetary responsibility of the International Union concerning the illegal fines already collected by Local 134, is hereby granted.
 
 
 52
 Judgment accordingly.
 
 
 53
 J. SKELLY WRIGHT, Circuit Judge, concurring in part and dissenting in part:
 
 
 54
 The opinion of my brethren in the majority is so carefully written and closely reasoned that I hesitate to express any disagreement with it. Indeed, insofar as the majority absolves the International of monetary liability and upholds the trial examiner's decision not to permit any amendment to the complaint, I concur in its judgment. But in this age of "strict constructionism" I simply cannot bring myself to believe that the words of Section 8(b)(1)(B) mean what the majority says they mean.
 
 
 55
 I am not suggesting that the Taft-Hartley Act need invariably be given a rigid or literal construction. Labor legislation does not always lend itself to the "plain meaning" school of jurisprudence. Cf. NLRB v. Allis-Chalmers Manufacturing Co., 388 U.S. 175, 179, 87 S.Ct. 2001, 18 L.Ed.2d 1123 (1967). But I am suggesting that it is improper for this court to condone a major shift in federal labor policy when the Labor Board can point to nothing in the words of the statute, nothing in its legislative history, and nothing in the ascertainable congressional purpose to support its action. "The deference owed to an expert tribunal cannot be allowed to slip into a judicial inertia which results in the unauthorized assumption by an agency of major policy decisions properly made by Congress." American Ship Building Co. v. N. L. R. B., 380 U.S. 300, 318, 85 S.Ct. 955, 13 L.Ed.2d 855 (1965). In my view, the determination whether supervisory personnel who are members of a union need protection from union discipline is one "properly made by Congress." For the moment, at least, Congress has decided not to grant supervisors this protection. Cf. 29 U.S.C. Sec. 152(3) (1970); Carpenters District Council of Milwaukee County, etc. v. NLRB, 107 U.S.App.D.C. 55, 57, 274 F.2d 564, 566 (1959). Until Congress changes its mind, I do not believe it proper for the Board to graft such protection onto the Act by twisting the clear meaning of an unrelated provision so as to serve a purpose which Congress never intended. I must, therefore, dissent from that portion of the majority's opinion and judgment which enforces the Board's Section 8(b)(1)(B) order.
 
 
 56
 * Section 8(b)(1)(B), 29 U.S.C. Sec. 158(b)(1)(B), provides: "It shall be an unfair labor practice for a labor organization or its agents * * * to restrain or coerce * * * an employer in the selection of his representatives for the purposes of collective bargaining or the adjustment of grievances * * *." The purpose of this provision is clear on its face. It is designed to prevent unions from restricting management's free choice of its agent to bargain with the union or adjust grievances. As Senator Taft explained on the Senate floor, "This unfair labor practice * * * is not perhaps of tremendous importance, but employees cannot say to their employer, 'We do not like Mr. X, we will not meet Mr. X. You have to send us Mr. Y.' That has been done. It would prevent their saying to the employer, 'You have to fire Foreman Jones. We do not like Foreman Jones, and therefore you have to fire him, or we will not go to work."' 2 Legislative History of the Labor Management Relations Act (hereinafter "Legis.Hist.") 1012 (1948). See also Senate Report No. 105 on S.1126, 80th Cong., 1st Sess., 21, in 1 Legis.Hist. 407, 427; speech of Senator Ellender, 2 Legis.Hist. 1077.[1]
 
 
 57
 That is the way Section 8(b)(1)(B) was interpreted for over 20 years after its initial enactment,[2] and during this entire period no one so much as suggested that it had any broader application.[3] Then, beginning in 1968, the Labor Board started to erode the original understanding as to the limits of Section 8(b)(1)(B). The process began with the Board's decision in San Francisco-Oakland Mailers' Union No. 18, 172 NLRB No. 252 (1968). In Oakland Mailers, management charged the union with attempting to discipline a foreman for the manner in which he interpreted the collective bargaining contract. Although there was no allegation that the union was attempting to coerce the employer into hiring a new representative for collective bargaining and adjustment of grievances, the Board nonetheless found a Section 8(b)(1)(B) violation. The union's actions, according to the Board, "were designed to change the [company's] representatives from persons representing the viewpoint of management to persons responsive or subservient to [the union's] will." Slip opinion at 2. This was the sort of pressure which Section 8(b)(1)(B) was designed to prevent. "That [the union] might have sought the substitution of attitudes rather than persons, and may have exerted its pressure upon the [company] by indirect rather than direct means, cannot alter the ultimate fact that pressure was exerted here for the purpose of interfering with the [company's] control over its representatives. Realistically, the [company] would have to replace its foremen or face de facto nonrepresentation by them." Id. at 3.
 
 
 58
 Standing alone, the Oakland Mailers doctrine places a permissible gloss on the statute.[4] Although Section 8(b)(1)(B) speaks literally in terms of coercing the "selection" of employer representatives, it is clear that management's right to a free selection would be hollow indeed if the union could dictate the manner in which the selected representative performed his collective bargaining and grievance settlement duties. But Oakland Mailers was not permitted to stand alone. After pausing briefly to consolidate its gains,[5] the Board again moved to expand the contours of the statute. In Meat Cutters Union Local 81, 185 NLRB No. 130 (1970), the Board found a Section 8(b)(1)(B) violation when a union attempted to discipline a supervisory employee for obeying a company order to institute a new meat procurement policy. Meat Cutters differed from Oakland Mailers in that no one claimed that the new procurement policy had anything to do with the supervisors' grievance settlement or collective bargaining functions.[6] It was thus unclear how management could claim that even a "substitution of attitudes" as to these functions had occurred. To be sure, a supervisor might be indirectly influenced in his bargaining and grievance settlement duties by union discipline exacted for his conduct in an unrelated area.[7] But this danger exists whenever a union disciplines a supervisor, and the Board had explicitly rejected a per se ban on all union discipline of supervisory employees. See Local Union 453, Brhd of Painters, Decorators & Paperhangers, 183 NLRB No. 24 (1970). Nonetheless, the Board read into the Act a congressional intent to require the undivided loyalty of supervisors to management in the performance of all their management functions and, on the basis of this reading, found a Section 8(b)(1)(B) violation.
 
 
 59
 When Meat Cutters was appealed to this court, we were clearly concerned that the Board's Section 8(b)(1)(B) decisions might be deteriorating into a flat prohibition against any union discipline of supervisors, thus giving supervisory personnel all the benefits of union membership without having to bear any of the responsibilities. In its Meat Cutters brief the Board sought to meet these fears and dispel them. "[I]t is only when the representative's obligations to the union conflict with his management responsibilities that his union obligations are compelled to yield," the Board argued. "Thus, in each case, including the instant case, where the Board has found a Section 8(b)(1)(B) violation based on union discipline of a management representative, the conduct which prompted disciplinary action consisted of the representative's efforts to discharge his management responsibilities. * * * In fact, the Board has recently dismissed a Section 8(b)(1)(B) complaint on the ground that the infraction of union rules for which the employer representative was disciplined did not involve the exercise of supervisory or managerial authority." NLRB brief in Meat Cutters Union Local 81, etc. v. NLRB, 147 U.S.App.D.C. 375, 458 F.2d 794 (1972), at 15.
 
 
 60
 Partially on the basis of these representations we enforced the Board's decision, but with the explicit caveat that "[t]he rule here applied by the Board only affects union discipline which is imposed upon a member, who has responsibilities as a representative of his employer in administering the collective bargaining agreement or the adjustment of employee grievances, because he has performed duties as a management representative. * * * The N.L.R.B. has made it clear that a union may legally discipline a supervisor-member for acts which are not performed by the individual in furtherance of his obligations as the employer's representative." Meat Cutters Union Local 81 v. NLRB, supra, 147 U.S.App.D.C. at 379-380 n.12, 458 F.2d at 798-799 n.12. (Emphasis in original.)
 
 
 61
 After this warning, I would have supposed it would be obvious to the Board that Section 8(b)(1)(B) had already been expanded to its limits. Yet the Board now seeks to expand it once again, this time by reading it in a way which, in the words of the learned trial examiner, "stretch[es] the statute beyond what I would otherwise consider the breaking point." Int. Brhd of Electrical Workers, 192 NLRB No. 17 (1971) (trial examiner's decision at 11). Despite the Board's explicit assurance that it would find Section 8(b)(1)(B) violations only when supervisors were fined for "the exercise of supervisory or managerial authority," the Board has here applied the statute to fines levied against supervisors for performance of ordinary rank-and-file work-work which could not possibly be considered to fall within their ordinary managerial responsibilities. This reading of the statute goes beyond Oakland Mailers, beyond Meat Cutters, and beyond anything which the Board has ever suggested in the past.[8] As the trial examiner pointed out, the previous cases are all
 
 
 62
 "readily distinguishable here where the action for which the supervisors were fined bore no direct relation to their work as supervisors or to any interpretation of the contract. As an original proposition I would be inclined to construe Section 8(b)(1)(B) as interdicting union fines of supervisors only when the conduct for which the supervisor was fined bore some relation to his role as a representative of management in 'collective bargaining or the adjustment of grievances,' to quote Section 8(b)(1)(B). In the instant case the question confronting the supervisors whether to work or to respect the strike call of their Union was in no way related to those subjects. Moreover, the Company itself has made it clear that it was not demanding that its supervisors work during the strike. On the contrary, the Company expressly left the decision up to each individual supervisor, with specific assurances that no reprisal would be visited on those who chose not to work. After the strike the Company promoted some of the supervisors who had not worked during the strike. I therefore find some difficulty in concluding that the Company was restrained or coerced by the Union's action in fining the supervisors who worked, or even in finding that the Union's action had any natural or inherent tendency to restrain or coerce the Company. * * *"
 
 
 63
 192 NLRB No. 17 (trial examiner's decision at 9).[9]
 
 
 64
 Like the trial examiner, I also find "some difficulty" in so concluding. In fact, as I hope to show in Part II of this opinion, the Board's present interpretation of Section 8(b)(1)(B), in spite of its explicit language, makes it an essentially limitless prohibition against any union discipline of supervisory personnel. Moreover, as Part III will show, this expansion of the statute is in the teeth of explicit Supreme Court decisions which give it a narrower scope. Finally, as I will argue in Part IV, the Board's reading of the statute finds no support in the policy of the Taft-Hartley Act and cannot be justified by reference to the Board's discretion in administering federal labor legislation.
 
 II
 
 65
 It seems to be conceded by all parties that, at least in theory, Section 8(b)(1)(B) does not absolutely proscribe all union discipline of supervisors who are union members. See majority opinion at note 28. Indeed, the Board so held in Local Union 453, Brhd of Painters, Decorators & Paperhangers, supra, and Judge MacKinnon's opinion in Meat Cutters expressly approved the Local Union 453 decision, See 147 U.S.App.D.C. at 379-380 n.12, 458 F.2d at 798-799 n.12. The Taft-Hartley Act does not compel supervisors to become union members, and an employer is within his rights if he insists that supervisory personnel remain nonunion. But if supervisors are permitted to join a union, they receive certain benefits from their union membership and incur certain concomitant obligations. Surely it cannot be doubted, for example, that a union could discipline a supervisor for refusing to pay his dues, for deliberately disrupting union meetings, or, to cite an example used by the trial examiner, for refusing to join a union bowling league.
 
 
 66
 To be sure, as Oakland Mailers makes clear, there are also some supervisory activities which Section 8(b)(1)(B) makes immune from union discipline. A supervisor-union member is in the difficult position of simultaneously serving two masters. Any sensible interpretation of the statute must, therefore, involve a determination of what obligations a supervisor owes to his union and what obligations he owes to his employer.
 
 
 67
 In its opinion today, the majority purports to adhere to these principles. It suggests that a supervisor is immune from union discipline only when he is performing "management functions" and that when he is engaged in "non-management" activity the union is free to impose reasonable fines. Unfortunately, however, the majority nowhere defines precisely what it means by "management functions" and it is clear from the way in which the test is applied that it in fact imposes no limits at all on the reach of Section 8(b)(1)(B).
 
 
 68
 At the outset, it should be clear that the "management function" test does not mean what this court has taken it to mean in the past. In Meat Cutters we upheld the Board's unfair labor practice finding because the supervisors were fined for engaging in usual and traditional management activity. But no one contends that the supervisors in this case were performing functions which supervisors usually or traditionally perform. The record shows that these supervisors were engaged in rank-and-file struck work which, under normal circumstances, was the responsibility of the ordinary employees. Saying that rank-and-file labor is an ordinary management function is like saying that black is white.[10] The two are usually perceived as diametrical opposites, so that if the one is taken to include the other, the concepts lose all meaning. Cf. General Tire & Rubber Co. v. NLRB, 1 Cir., 451 F.2d 257, 258-259 (1971).[11]
 
 
 69
 Perhaps the majority means to suggest that the supervisors are engaged in a "management function" whenever they take action pursuant to a management order. It should be noted, however, that this reading of the statute is at war with the notion that a supervisor undertakes certain duties when he joins a union and that these duties are enforceable by appropriate union sanctions. Suppose, for example, that management orders its supervisors to disrupt a lawful union meeting. Could it seriously be argued that the union must tolerate this disturbance without taking disciplinary action because the supervisors were merely "following orders"? If, as argued above, Section 8(b)(1)(B) leaves intact some duties which supervisormembers owe to their unions, then it cannot be that these duties can be abrogated merely because management orders their abrogation. Moreover, even if the management order test were a defensible limiting principle, it would not support the Board's decision in this case. As the majority itself points out, there was no management order here requiring supervisors to perform rank-and-file work. On the contrary, management explicitly informed the supervisors that they would not be required to cross the picket line during the strike, and several supervisors who declined to do so were subsequently promoted.
 
 
 70
 My brethren seek to avoid this embarrassment by suggesting that the proper test is not whether the supervisors acted pursuant to a management order, but rather whether their actions were undertaken in the interests of management. It should be apparent, however, that this test fares no better as a limiting principle than the management order test. In fact, to the extent that management and union are viewed as adversaries, it is always in management's interests for the supervisors to take actions which weaken the union. For example, it might well be in management's interest for the supervisors to stop paying their union dues, thereby depleting the union's financial resources and limiting its strike capability. Yet all concede that it would be intolerable for supervisors to retain all the benefits of union membership without any enforceable duty to bear some of the financial burdens.
 
 
 71
 The "management interest" test also fails to justify the actions of the Board concerning the Bell Supervisors Association issue. The Board found that the union committed a Section 8(b)(1)(B) violation when it fined the supervisors for forming the so-called "Bell Supervisors Protective Association." The Protective Association was formed in part for the purpose of prosecuting an unfair labor practice charge against the company.[12] Thus if one wishes to explain this case in terms of a "management interest" standard, it must be contended that the company had an interest in prosecuting an unfair labor practice against itself!
 
 
 72
 I submit that there is something inherently wrong with a mode of statutory analysis that yields a product as nonessential as this. This court purports to limit Section 8(b)(1)(B) to union discipline for performance of management activities ordered by management or taken in the interests of management. Yet it then proceeds to apply the provision to a nonmanagement activity not ordered by management and directly contrary to management's interests. I am forced to conclude that the unfair labor practices found in this case are ultimately explicable only if one assumes that all union fines of supervisor-members are unlawful on their face. But that is the one theory which my brethren explicitly disavow and which the statute will not permit.
 
 III
 
 73
 The Board's rough sailing through the complexities of Section 8(b)(1)(B) might, perhaps, be more understandable if the seas were entirely uncharted. But in fact union discipline of strikebreakers and other dissidents has been the subject of a series of important Supreme Court decisions which the Board inexplicably chose to ignore. These decisions, unlike the Board's approach, set out a rational, workable interpretation of Section 8(b)(1) which balances the union's right to enforce reasonable discipline against the rights of employers and union members to be free from union overreaching. They should, I think, control the outcome of this case.
 
 
 74
 The first and most important of these decisions is NLRB v. Allis-Chalmers Manufacturing Co., supra. In all relevant respects, Allis-Chalmers is indistinguishable from this case. There, as here, the union sought to impose reasonable fines on union members who had crossed a picket line during a lawful strike. In Allis-Chalmers, however, none of the fined members were supervisors, so the relevant provision governing the union's conduct was subsection (A) of Section 8(b)(1) rather than subsection (B).[13] However, when the Supreme Court fund the union innocent of any unfair labor practice, it did so not because of anything in subsection (A), but rather because of its interpretation of the words "restrain or coerce" which are common to subsections (A) and (B). See Christensen, Union Discipline Under Federal Law: Institutional Dilemmas in an Industrial Democracy, 43 N.Y.U.L.Rev. 227, 268 (1968). Thus the Court stated: "It is highly unrealistic to regard Sec. 8(b)(1), and particularly its words 'restrain or coerce,' as precisely and unambiguously covering the union conduct involved in this case." 388 U.S. at 179, 87 S.Ct. at 2006. (Emphasis added.) On the contrary, such a reading of Section 8(b)(1) would "attribute to Congress an intent at war with the understanding of the union-membership relation which has been at the heart of its effort 'to fashion a coherent labor policy' and which has been a predicate underlying action by this Court and the state courts. More importantly, it is to say that Congress limited unions in the powers necessary to the discharge of their role as exclusive statutory bargaining agents by impairing the usefulness of labor's cherished strike weapon." Id. at 183, 87 S.Ct. at 2008.
 
 
 75
 Of course, Allis-Chalmers did not mean that unions were free to impose discipline for any purpose at all. Section 8(b)(1) must be read so as to conform with the other provisions of federal labor law. See, e. g., NLRB v. Int. Ladies' Garment Workers Union, 3 Cir., 274 F.2d 376 (1960); Silard, Labor Board Regulation of Union Discipline After Allis-Chalmers, Marine Workers and Scofield, 38 Geo.Wash.L.Rev. 187, 193-196 (1969). Thus if a union rule "invades or frustrates an overriding policy of the labor laws the rule may not be enforced, even by fine or expulsion, without violating Sec. 8(b)(1)." Scofield v. NLRB, 394 U.S. 423, 429, 89 S.Ct. 1154, 22 L.Ed.2d 385 (1969). See NLRB v. Industrial Union of Marine & Shipbuilding Workers, 391 U.S. 418, 88 S.Ct. 1717, 20 L.Ed.2d 706 (1968). But if one thing is clear after Allis-Chalmers, it is that there is no "overriding policy of the labor laws" which prohibits reasonable union fines levied against members who cross a lawful picket line to perform rank-and-file struck work. In fact, quite the contrary is true.
 
 
 76
 "Integral to [the] federal labor policy has been the power in the chosen union to protect against erosion its status under that policy through reasonable discipline of members who violate rules and regulations governing membership. That power is particularly vital when the members engage in strikes. The economic strike against the employer is the ultimate weapon in labor's arsenal for achieving agreement upon its terms, and '[t]he power to fine or expel strike-breakers is essential if the union is to be an effective bargaining agent . . .' * * *"
 
 
 77
 NLRB v. Allis-Chalmers Manufacturing Co., supra, 388 U.S. at 181, 87 S.Ct. at 2006. (Footnotes omitted.)
 
 
 78
 The majority utilizes two arguments in attempting to distinguish Allis-Chalmers. First my brethren contend that the Allis-Chalmers Court relied on the proviso in Section 8(b)(1)(A)-a proviso which is not attached to subjection (B) of Section 8(b)(1).[14] I must admit I find it difficult to understand how the majority can maintain this position in light of the Allis-Chalmers Court's explicit disclaimer of any reliance on the proviso.[15] As Mr. Justice Black pointed out in dissent: "Since the union resorted to the courts to enforce its fines instead of relying on its own internal sanctions such as expulsion from membership, the Court correctly assumes that the proviso to Sec. 8(b)(1)(A) cannot be read to authorize its holding." 388 U.S. at 200, 87 S.Ct. at 2017. (Emphasis added.) Only a few months ago Judge MacKinnon, speaking for a unanimous panel, characterized the holding in Allis-Chalmers as follows: "Instead of relying upon the express language of the proviso, * * * the Supreme Court carefully analyzed the entire legislative history of Section 8(b)(1)(A), and it concluded that Congress did not intend to prohibit such internal union discipline by the prohibition against 'restraint' or 'coercion."' Booster Lodge No. 405, Int. Assn of Machinists v. NLRB, 148 U.S.App.D.C. 119, 125, 459 F.2d 1143, 1149, (1972). In light of this statement, I am frankly amazed to see the proviso argument resurrected at this late date.[16]
 
 
 79
 Perhaps sensing that substantial reliance on the proviso does little to advance its position, the majority resorts to a second argument. Allis-Chalmers, it is argued, dealt only with internal union rules affecting the relationship between a member and the labor organization to which he belongs. Here, however, the union rule had an "effect on parties external to [the union-member] relationship" and therefore falls outside the Allis-Chalmers rationale. Majority opinion at - of 159 U.S.App.D.C., at 1123 of 487 F.2d.
 
 
 80
 This distinction is so subtle that someone in an uncharitable frame of mind might be tempted to characterize it as altogether chimerical. It seems clear, for example, that the union rule in Allis-Chalmers had, and was intended to have, an external effect on the employer. By deterring strikebreakers, the rule assured union solidarity and thereby allowed the union to bring greater economic pressure on the company. I simply cannot understand why the antistrikebreaking rule in Allis-Chalmers should be characterized as "internal" while precisely the same sort of antistrikebreaking rule in this case suddenly becomes "external."
 
 
 81
 Perhaps there is nonetheless some substance to the internal-external dichotomy, but the distinction, if one exists, was apparently too subtle for the Supreme Court to grasp. In Scofield v. NLRB, supra, the Court unambiguously rejected the internal-external test as a basis for resolving Section 8(b)(1) cases. "It is doubtless true," the Court conceded, "that the union rule in question here affects the interests of all three participants in the labor-management relation: employer, employee, and union. Although the enforcement of the rule is handled as an internal union matter, the rule has and was intended to have an impact beyond the confines of the union organization. But as Allis-Chalmers and Marine Workers made clear, it does not follow from this that the enforcement of the rule violates Sec. 8(b)(1)(A) unless some impairment of a statutory labor policy can be shown." 394 U.S. at 431-432, 89 S.Ct. at 1159. (Footnote omitted.) Similarly, I do not see why the external impact of this union rule should affect its validity. The majority ignores the fact that the very purpose of having a union is to affect external relations between employees and their employer. All union rules are therefore "external" since they are all designed to insure a strong and united front among union members when the union confronts its employer adversary. Allis-Chalmers, Scofield and Marine Workers stand for the proposition that such rules may nonetheless be enforced "unless some impairment of a statutory labor policy can be shown." And Allis-Chalmers makes clear that there is no impairment of "statutory labor policy" when, as here, a union takes reasonable action to insure strike solidarity among its members.
 
 IV
 
 82
 Of course, it is true that Allis-Chalmers dealt with fines imposed on ordinary members while here the fines were imposed on supervisors. As argued above, this fact is without relevance to the problem of statutory construction, since the Allis-Chalmers Court relied on the general language of Section 8(b)(1) which is applicable to both subsections (A) and (B). Nonetheless, the difference between the two cases might be relevant to the existence of a countervailing "statutory labor policy" which would justify finding a Section 8(b)(1) violation. Specifically, the majority argues that, even if there is no "statutory labor policy" favoring the freedom of union members to perform struck work, there is such a policy which favors insulating supervisory personnel from union discipline.
 
 
 83
 If this argument is kept within proper bounds, I think it has some validity. Indeed, I think Section 8(b)(1)(B) itself expresses a statutory labor policy which favors allowing supervisory personnel to perform their collective bargaining and grievance settling functions free from union coercion. That, as I understand it, was the holding of Oakland Mailers, and I have no quarrel with that decision. But the Board has not kept this argument within proper bounds. Instead, the Board purports to find a broader "statutory labor policy" requiring that the supervisor's absolute duty to his employer always take precedence over any conflicting duty to his union.
 
 
 84
 With all respect, I think this policy has been manufactured out of whole cloth. While the majority finds it "intuitively obvious" that such a policy exists, majority opinion at 159 of _____ U.S.App.D.C., at 1122 of 487 F.2d, it is unable to cite a single court decision, a single provision in the statute, or a single element of the legislative history to support its conclusion.[17] To be sure, Section 2(3) of the Act allows an employer to keep his supervisors out of the union,[18] and a union may even commit an unfair labor practice if it bargains to an impasse over unionization of supervisors. See International Typographical Union v. NLRB, 1 Cir., 278 F.2d 6 (1960). But here the employer chose not to exercise his option to have nonunion supervisors. The company agreed that supervisory personnel would be union members, and Section 14(a) of the Act makes that agreement legal.[19]
 
 
 85
 We can be safe in assuming that neither the union nor management agreed to the unionization of supervisors because of an abstract belief in the virtues of trade unionism. The union presumably insisted on this clause in the contract so that it would have some control over the actions of supervisors, and management presumably accepted it because the union gave up something else in return. By enacting Section 14(a), which permits supervisors to join unions, Congress expressly permitted management and labor to reach just such an agreement. See also 29 U.S.C. Sec. 158(a)(3)(i) (1970). Yet now management seeks to abrogate its part of the bargain by insisting that supervisors obey management alone. Like the Supreme Court, I can "discern no basis in the statutory labor policy encouraging collective bargaining for giving the employer a better bargain than he has been able to strike at the bargaining table." Scofield v. NLRB, supra, 394 U.S. at 433, 89 S.Ct. at 1159.
 
 
 86
 Nor can I see a basis in federal labor policy for permitting supervisors to retain all the benefits of union membership while incurring none of the costs. As Professor Gould has pointed out:
 
 
 87
 "* * * [S]upervisors who remain union members are most often obtaining additional benefits. Frequently, they have remained members in order to retain possession of withdrawal cards which will make it less expensive for them to re-enter the trade or another plant under union jurisdiction. Under the Allis-Chalmers rationale, this would seem to indicate a pledge of allegiance by the supervisor and therefore should be deemed consent by such an individual to render himself liable to financial obligations where the union's interest is direct and where the conduct engaged in is somewhat distant from basic supervisory functions. If the employer is unduly harmed by such a rule, it seems to me that its obligation is to make the supervisory position financially attractive enough for the supervisor to forego the benefits of union membership and to resign."
 
 
 88
 Gould, Some Limitations Upon Union Discipline Under the National Labor Relations Act: The Radiations of Allis-Chalmers, 1970 Duke L.J. 1067, 1129 (1970).
 
 
 89
 To be sure, the Labor Board is entitled to great deference when it interprets the act it administers. See, e. g., Brooks v. NLRB, 348 U.S. 96, 75 S.Ct. 176, 99 L.Ed. 125 (1954); Republic Aviation Corp. v. NLRB, 324 U.S. 793, 65 S.Ct. 982, 89 L.Ed. 1372 (1945). But this deference has its limits. In the final analysis, "administrative experience is of weight in judicial review only to this point-it is a persuasive reason for deference to the [Board] in the exercise of its discretionary powers under and within the law. It cannot be invoked to support action outside of the law. And what action is, and what is not, within the law must be determined by courts, when authorized to review, no matter how much deference is due to the agency's fact finding. Surely an administrative agency is not a law unto itself * * *." SEC v. Chenery Corp., 332 U.S. 194, 215, 67 S.Ct. 1760, 1762, 91 L.Ed. 1995 (1947) (Mr. Justice Jackson, dissenting).
 
 
 90
 In my view, the Labor Board's action in this case was outside the law. I submit that the Section 8(b)(1)(B) requirement that unions not "restrain or coerce * * * an employer in the selection of his representatives for the purposes of collective bargaining or the adjustment of grievances" cannot reasonably be read to prohibit discipline of union members-supervisors though they be-for performance of rank-and-file struck work. I would therefore decline to enforce the Board's order.
 
 
 
 *
 Sitting by designation pursuant to 29 U.S.C. Sec. 294(c) (1970)
 
 
 [1]
 "P.B.X." is the abbreviation for "private branch exchange," the telephone apparatus installed and maintained by the Company on the private premises of a customer
 
 
 [2]
 This arrangement whereby foremen and rank-and-file employees have been included in the same bargaining unit was voluntarily consented to by the Employer
 
 
 [3]
 Although collective bargaining agreements between the parties had at one time prescribed the monthly wage rates applicable to foremen, recent contracts have not contained such wage provisions. However, the agreement relevant here included a section entitled "Working Conditions for General Foremen and Foremen," which concerned payment for overtime work and for certain absences. Furthermore, when the Company recently revised the overtime schedule pertaining to foremen, it requested the concurrence of Local 134
 
 
 [4]
 "Rank-and-file work" concerns that work which is ordinarily performed by regular, non-supervisory employees in the bargaining unit
 
 
 [5]
 Pursuant to the union-shop provision in the applicable collective bargaining agreement, these foremen were all full members of Local 134
 
 
 [6]
 29 U.S.C. Sec. 158(b)(1)(B) (1970) provides: "It shall be an unfair labor practice for a labor organization or its agents-(1) to restrain or coerce * * * (B) an employer in the selection of his representatives for the purposes of collective bargaining or the adjustment of grievances"
 
 
 [7]
 29 U.S.C. Sec. 158(a)(3) (1970) provides in relevant part:
 (a) It shall be an unfair labor practice for an employer-. . .
 (3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization: Provided, That nothing in this subchapter, or in any other statute of the United States, shall preclude an employer from making an agreement with a labor organization (not established, maintained, or assisted by any action defined in this subsection as an unfair labor practice) to require as a condition of employment membership therein on or after the thirtieth day following the beginning of such employment or the effective date of such agreement, whichever is the later, (i) if such labor organization is the representative of the employees as provided in section 159(a) of this title, in the appropriate collective-bargaining unit covered by such agreement when made, * * *
 Since the bargaining unit included supervisors [see note 12 and accompanying text and note 24, infra] with regular rank-and-file employees, the Association contended that the unit covered by the Company-Local 134 union-shop provision was not "appropriate" within the meaning of section 8(a)(3)(i). However, due to the fact that Local 134 was the only one of the two contracting parties before the Trial Examiner, the Association did not allege a violation of section 8(a)(3)(i), which only applies to employers, but it instead asserted the presence of a section 8(b)(2) violation. 29 U.S.C. Sec. 158(b)(2) (1970) provides, inter alia: "It shall be an unfair labor practice for a labor organization or its agents- * * * (2) to cause or attempt to cause an employer to discriminate against an employer in violation of subsection (a)(3) of this section [i. e., section 8(a)(3)] * * *"
 
 
 [8]
 It is important to note that the precise issue concerning the legality of the union-security provision under section 8(a)(3)(i) of the N.L.R.A. had been previously raised by the Association, in 1968, at which time the General Counsel of the Labor Board refused to issue a complaint relating to the Association's unfair labor practice charge. Case 13-CA-8451. At that time, the General Counsel concluded:
 The inclusion of alleged supervisors in the unit by voluntary agreement of the contracting parties did not, standing alone, constitute an unfair labor practice, nor did it render such unit inappropriate for coverage by an otherwise valid union security clause. See Nassau & Suffolk Contractors Ass'n., 118 NLRB 174, 177-184; * * *
 
 
 [9]
 See note 8 supra
 
 
 [10]
 International Brotherhood of Electrical Workers, AFL-CIO, and Local 134, I.B.E.W., 192 NLRB No. 17, T.X.D. slip op. at 13, 1971 CCH NLRB p 23,282 (1971)
 
 
 [11]
 Id
 
 
 [12]
 29 U.S.C. Sec. 152(11) (1970). See N. L. R. B. v. Henry Colder Co., 416 F.2d 750, 754 n. 3 (7th Cir. 1969), and cases cited therein
 
 
 [13]
 See note 6 supra. Local 134 and the International Union have not challenged, on appeal, the Labor Board's findings that the foremen were "supervisors" and "Employer representatives," within the meaning of the N.L.R.A
 
 
 [14]
 The Labor Board found the International Union in violation of section 8(b)(1)(B), due to its affirmance, on appeal, of Local 134's imposition of disciplinary fines against the foremen. However, the Board's remedial order only provided for secondary liability on the part of the International Union with respect to the reimbursement of already collected fines and the providing of individual written notices for the disciplined foremen
 
 
 [15]
 See note 6 supra
 
 
 [16]
 See Meat Cutters Union Local 81 of Amalgamated Meat Cutters and Butcher Workmen of North America v. N. L. R. B., 147 U.S.App.D.C. 375, 379, 458 F.2d 794, 798 (1972); N. L. R. B. v. Local 294, International Brotherhood of Teamsters, etc., 284 F.2d 893 (2nd Cir. 1960); Los Angeles Cloak Joint Board, 127 NLRB 1543, 1550-1551 (1960); International Union of Operating Engineers, Local 825, 145 NLRB 952, 962 (1964)
 
 
 [17]
 172 NLRB No. 252, slip op. at 2, 1968-2 CCH NLRB p 20,195
 
 
 [18]
 172 NLRB No. 252, slip op. at 2-3, 1968-2 CCH NLRB p 20,195 (emphasis supplied). See New Mexico District Council of Carpenters and Joiners of America, 176 NLRB No. 105, slip op. at 4-5, 1969 CCH NLRB p 20,951 (1969), enfd., 67 L.C. p 12,403 (10th Cir. 1972)
 
 
 [19]
 Meat Cutters Union Local 81 of Amalgamated Meat Cutters and Butcher Workmen of North America v. N. L. R. B., 147 U.S.App.D.C. 375, 458 F.2d 794 (1972)
 
 
 [20]
 Id., 147 U.S.App.D.C. at 379-380, 458 F.2d at 798-799
 
 
 [21]
 N. L. R. B. v. Allis-Chalmers Mfg. Co., 388 U.S. 175, 179, 87 S.Ct. 2001, 18 L.Ed.2d 1123 (1967)
 
 
 [22]
 II Legislative History of the Labor Management Relations Act, 1947 (N.L.R.B.1948) [hereafter "Legislative History"] at 1077 (comments of Senator Ellender). See S.Rep.No.105, 80th Cong., 1st Sess. 21 (1947), in I Legislative History at 427; II Legislative History at 1524 (comments of Senator Ball)
 
 
 [23]
 See sections 2(3), 2(11), and 14(a), 29 U.S.C. Secs. 152(3), 152(11), and 164(a) (1970)
 
 
 [24]
 29 U.S.C. Sec. 152(3) (1970) provides, inter alia: "The term 'employee' shall include any employee * * * but shall not include * * * any individual employed as a supervisor * * *" See section 2(11) of the Act, 29 U.S.C. Sec. 152(11) (1970), for the statutory definition of "supervisor."
 
 
 [25]
 Carpenters District Council of Milwaukee County, etc., v. N. L. R. B., 107 U.S.App.D.C. 55, 57, 274 F.2d 564, 566 (1959) (emphasis supplied). See II Legislative History at 1524 (comments of Senator Ball)
 
 
 [26]
 Meat Cutters Union Local 81 of Amalgamated Meat Cutters and Butcher Workmen of North America v. N. L. R. B., 147 U.S.App.D.C. 375, 381, 458 F.2d 794, 800 (1972). See Texas Co. v. N. L. R. B., 198 F.2d 540, 542 (9th Cir. 1952), wherein the court stated that "it is clear from the history of the Taft-Hartley legislation that Congress intended to restore to employers the right and power to insist upon the undivided loyalty of their supervisory personnel."
 
 
 [27]
 San Francisco-Oakland Mailers' Union No. 18, International Typographical Union, 172 NLRB No. 252, slip op. at 3, 1968-2 CCH NLRB p 20,195 (1968)
 
 
 [28]
 This interpretation of section 8(b)(1)(B) does not mean that a union may never discipline a supervisor/member for breaching a valid union rule. See, e. g., Local 453, Brotherhood of Painters, Decorators and Paperhangers of America, 183 NLRB No. 24, 1970 CCH NLRB p 21,981 (1970). It only proscribes union interference for acts performed by a supervisor relating to his supervisory or managerial duties. See Meat Cutters Union Local 81 of Amalgamated Meat Cutters and Butcher Workmen of North America v. N. L. R. B., 147 U.S.App.D.C. 375, 458 F.2d 794 (1972)
 
 
 [29]
 29 U.S.C. Sec. 164(a) (1970) provides:
 (a) Nothing herein shall prohibit any individual employed as a supervisor from becoming or remaining a member of a labor organization, but no employer subject to this subchapter shall be compelled to deem individuals defined herein as supervisors as employees for the purpose of any law, either national or local, relating to collective bargaining.
 
 
 [30]
 N. L. R. B. v. Allis-Chalmers Mfg. Co., 388 U.S. 175, 87 S.Ct. 2001, 18 L.Ed.2d 1123 (1967)
 
 
 [31]
 Scofield v. N. L. R. B., 394 U.S. 423, 89 S.Ct. 1154, 22 L.Ed.2d 385 (1969)
 
 
 [32]
 See Meat Cutters Union Local 81 of Amalgamated Meat Cutters and Butcher Workmen of North America v. N. L. R. B., 147 U.S.App.D.C. 375, 381-382, 458 F.2d 794, 800-801 (1972)
 
 
 [33]
 29 U.S.C. Sec. 158(b)(1)(A) (1970) provides:
 (b) It shall be an unfair labor practice for a labor organization or its agents-
 (1) to restrain or coerce (A) employees in the exercise of the rights guaranteed in section 157 of this title: Provided, That this paragraph shall not impair the right of a labor organization to prescribe its own rules with respect to the acquisition or retention of membership therein;
 See 29 U.S.C. Sec. 157 (1970).
 
 
 [34]
 Compare Booster Lodge No. 405, International Association of Machinists and Aerospace Workers v. N. L. R. B., 148 U.S.App.D.C. 119, 125, 459 F.2d 1143, 1149, with Meat Cutters Union Local 81 of Amalgamated Meat Cutters and Butcher Workmen of North America v. N. L. R. B., 147 U.S.App.D.C. 375, 381, 458 F.2d 794, 800 (1972)
 
 
 [35]
 See San Francisco-Oakland Mailers' Union No. 18, International Typographical Union, 172 NLRB No. 252, slip op. at 4, 1968-2 CCH NLRB p 20,195 (1968); Price v. N. L. R. B., 373 F.2d 443, 446 (9th Cir. 1967), cert. denied, 392 U.S. 904, 88 S.Ct. 2051, 20 L.Ed.2d 1363 (1968); Meat Cutters Union Local 81 of Amalgamated Meat Cutters and Butcher Workmen of North America v. N. L. R. B., 147 U.S.App.D.C. 375, 381-382, 458 F.2d 794, 800-801 (1972). See also II Legislative History at 1139, 1141, and 1200
 
 
 [36]
 See also N. L. R. B. v. Sheet Metal Workers Intern. Ass'n, Local 49, A.F.L.-C.I.O., 430 F.2d 1348, 1350 (10th Cir. 1970); N. L. R. B. v. Toledo Locals Nos. 15-P and 272 of Lithographers and Photo-Engravers International Union, 437 F.2d 55, 57 (6th Cir. 1971)
 
 
 [37]
 See Silard, Labor Board Regulation of Union Discipline After Allis-Chalmers, Marine Workers and Scofield, 38 Geo. Wash.L.Rev. 187, 196 (1969):
 [I]n safeguarding the regulation of union membership from Labor Board review Congress did not authorize unions to violate with impunity the protected rights of other parties-particularly of employers, neutrals, and the public.
 
 
 [38]
 It is vitally important to remember that sections 8(b)(1)(A) and 8(b)(1)(B) protect different interests. Section 8(b)(1)(A) was only intended to impose some slight controls upon the union-employee relationship, and the legislative history makes it clear that Congress did not intend extensive regulation of the internal union-employee/member relationship. See N. L. R. B. v. Allis-Chalmers Mfg. Co., 388 U.S. 175, 183-195, 87 S.Ct. 2001, 18 L.Ed.2d 1123 (1967). See also National Maritime Union, 78 NLRB 971, 982-987 (1948), enfd., 175 F.2d 686 (2nd Cir. 1949), cert. denied, 338 U.S. 954, 70 S.Ct. 492, 94 L.Ed. 589 (1950). Section 8(b)(1)(B), on the other hand, was clearly intended to regulate the external union-employer relationship. It is therefore apparent that considerations concerning the right of a labor organization to regulate its internal union affairs are not really relevant when the union action in question has meaningful external effects upon an employer, in an area wherein the employer is expressly protected under the Act
 
 
 [39]
 See also District 50, Local 12419, 176 NLRB No. 25, 71 LRRM 1311 (1969); N. L. R. B. v. International Molders and Allied Workers Union, Local 125, 442 F.2d 92, 94 (7th Cir. 1971)
 
 
 [40]
 Although there may be some persons unfamiliar with the Congressional attitudes which prevailed in 1947 who might believe that it is not appropriate to treat the fining of supervisor/members for working during a strike differently from the disciplining of employee/members for the same acts, the superficial surface similarity between the two events underlying the union discipline cannot obfuscate the extremely important difference between "supervisors" and "employees" which is recognized by their different treatment under the N.L.R.A. Had the 1947 Congress intended for such persons to be treated alike, it surely would not have enacted section 8(b)(1)(B) and the exclusionary portion of section 2(3) relating to supervisory personnel
 
 
 [41]
 International Brotherhood of Electrical Workers and Local 134, I.B.E.W., 192 NLRB No. 17, T.X.D., slip op. at 7, as adopted by N.L.R.B., slip op. at 2, 1971 CCH NLRB p 23,282 (1971)
 
 
 [42]
 See N. L. R. B. v. Allis-Chalmers Mfg. Co., 388 U.S. 175, 180-181, 87 S.Ct. 2001, 18 L.Ed.2d 1123 (1967). See also Booster Lodge No. 405, International Association of Machinists and Aerospace Workers v. N. L. R. B., 148 U.S.App.D.C. 119, 125-126, 459 F.2d 1143, 1149-1150 (1972)
 
 
 [43]
 See Part I(A) of this opinion, supra
 
 
 [44]
 There is no question that supervisors enhance the bargaining position of their employer when they perform rank-and-file work during a strike, since their actions reduce the severity of the economic pressure borne by their employer as a result of the work stoppage
 
 
 [45]
 The unions have not challenged the finding of the Labor Board regarding the representative status of the supervisors
 
 
 [46]
 Local Union No. 2150, International Brotherhood of Electrical Workers, 192 NLRB No. 16, slip op. at 6-7, 1971 CCH NLRB p 23,280 (1971). See New Mexico District Council of Carpenters and Joiners of America, 177 NLRB 500, 502 (1969), enfd., 454 F.2d 1116 (10th Cir. 1972); Meat Cutters Union Local 81 of Amalgamated Meat Cutters and Butcher Workmen of North America v. N. L. R. B., 147 U.S.App.D.C. 375, 379-380, 458 F.2d 794, 798-799 (1972); N. L. R. B. v. Sheet Metal Workers Intern. Ass'n., Local 49, A.F.L.-C.I.O., 430 F.2d 1348, 1349 (10th Cir. 1970). See also Part I (A) of this opinion, supra, and cases cited therein
 
 
 [47]
 See 29 U.S.C. Secs. 160(e) and 160(f) (1970). See also Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951)
 
 
 [48]
 International Brotherhood of Electrical Workers and Local 134, I.B.E.W., 192 NLRB No. 17, T.X.D. slip op. at 10, as adopted by N.L.R.B., slip op. at 2, 1971 CCH NLRB p 23,282 (1971) (emphasis in original)
 
 
 [49]
 See Parts I(A) and II(A) of this opinion, supra
 
 
 [50]
 Although one of the Association's obvious interests concerned the legality of the union-security provision in the Company-Local 134 collective bargaining agreement, it is important to recognize that it was the strike which precipitated the supervisors' concern regarding this issue. It was not until they realized that Local 134 intended to utilize their forced union membership to subvert their loyalty to the Employer that the supervisors undertook to form the Association to protect their position, as well as the interests of their Employer
 
 
 [51]
 International Brotherhood of Electrical Workers and Local 134, I.B.E.W., 192 NLRB No. 17, slip op. at 6-7, 1971 CCH NLRB p 23,282 (1971)
 
 
 [52]
 See Meat Cutters Union Local 81 of Amalgamated Meat Cutters and Butcher Workmen of North America v. N. L. R. B., 147 U.S.App.D.C. 375, 380-381, 458 F.2d 794, 799-800 (1972); N. L. R. B. v. Toledo Locals Nos. 15-P and 272 of Lithographers and Photo-Engravers International Union, 437 F.2d 55, 57 (6th Cir. 1971); San Francisco-Oakland Mailers' Union No. 18, International Typographical Union, 172 NLRB No. 252, slip op. at 2-3, 1968-2 CCH NLRB p 20,195 (1968)
 
 
 [53]
 29 U.S.C. Sec. 160(c) (1970). See Phelps Dodge Corp. v. N. L. R. B., 313 U.S. 177, 194, 61 S.Ct. 845, 85 L.Ed. 1271 (1941); Virginia Electric & Power Co. v. N. L. R. B., 319 U.S. 533, 540, 63 S.Ct. 1214, 87 L.Ed. 1568 (1943); Amalgamated Clothing Workers of America v. N. L. R. B., 125 U.S.App.D.C. 275, 281, 371 F.2d 740, 746 (1966); Office and Professional Employees International Union, Local 425 A.F.L.-C.I.O. v. N. L. R. B., 136 U.S.App.D.C. 12, 19-20, 419 F.2d 314, 321-322 (1969)
 
 
 [54]
 Id
 
 
 [55]
 No approval or specific authorization regarding Local 134's illegal disciplinary action was requested from, or given by, the International Union before or during the course of the local union proceedings. Nor did the International Union Constitution or By-laws mandate such unlawful action by local unions
 
 
 [56]
 Section 2(13) of the N.L.R.A., 29 U.S.C. Sec. 152(13) (1970)
 
 
 [57]
 Regarding the relevant legislative history pertaining to section 2(13), see H.Rep. No. 245, 80th Cong., 1st Sess. 11 (1947), in I Legislative History at 302; H.Conf.Rep. No. 510, 80th Cong., 1st Sess. 36 (1947), in I Legislative History at 540; 93 Cong.Rec. 6442, 6534, and 6859 (1947)
 
 
 [58]
 Although the N.L.R.B. argues that the International Union should be held monetarily responsible due to the Board's assertion that the fines imposed by Local 134 were "illegal on their face," we reject this contention. Labor Board and court decisions had not previously defined this extremely difficult area with such exactness that the International Union could reasonably be considered to have affirmed obviously unlawful action by Local 134
 We intimate no view concerning the proper liability of a national or international union in a case where it does affirm a local union's disciplinary action on appeal, where it is clear that the local union's action is unlawful on its face, preferring to leave the resolution of this issue to a more appropriate occasion.
 
 
 [59]
 [The International Union's] only action in the case was the exercise of its function to hear the appeal[s] and review the action[s] of the local body. * * * [The International Union] could not be held liable in damages to the [disciplined supervisor/members] because it affirmed [Local 134's actions,] in the absence of fraud or bad faith
 People ex rel. Solomon v. Brotherhood of Painters, Decorators and Paperhangers of America, 218 N.Y. 115, 112 N.E. 752, 754 (1916).
 
 
 [60]
 See section 10(c), 29 U.S.C. Sec. 160(c) (1970). The decisions cited by the N.L.R.B. in support of the imposition of monetary responsibility upon the International Union here are not apposite, since they entailed a greater degree of participation by the international unions involved. See, e. g., N. L. R. B. v. Millwrights, Local 2232, District Council of Houston, etc., 277 F.2d 217, 221 (5th Cir. 1960), cert. denied, 366 U.S. 908, 81 S.Ct. 1083, 6 L.Ed.2d 234 (1961); Local Union, 984, International Brotherhood of Teamsters, etc. v. Humko Co., Inc., 287 F.2d 231, 242 (6th Cir.), cert. denied, 366 U.S. 962, 81 S.Ct. 1922, 6 L.Ed.2d 1254 (1961)
 
 
 [61]
 See note 7 supra
 
 
 [62]
 See note 8 supra
 
 
 [63]
 Although the prior charge filed by the Association had alleged a section 8(a)(3) violation, while the proposed amendment suggested a section 8(b)(2) violation, the two charges were based upon the identical allegation that the Company-Local 134 union-security agreement was in violation of the requirements of section 8(a)(3)(i). See note 7 supra
 
 
 [64]
 See International Brotherhood of Electrical Workers and Local 134, I.B.E.W., 192 NLRB No. 17, T.X.D. slip op. at 13, 1971 CCH NLRB p 23,282 (1971). The Trial Examiner also indicated that such union-shop provisions had been present in similar cases recently before the Labor Board, without any indication by it that such agreements might be violative of the N.L.R.A. Id
 
 
 [65]
 29 U.S.C. Sec. 160(b) (1970) provides inter alia: "Any such complaint may be amended by the member, agent, or agency conducting the hearing or the Board in its discretion at any time prior to the issuance of an order based thereon." The scope of this language, which was part of the original 1935 Wagner Act, may have been limited, however, by the enactment in 1947 of an amendment to the N.L.R.A., which provides that the General Counsel "shall have final authority, on behalf of the Board, in respect of the investigation of charges and issuance of complaints under section 160 of this title, and in respect of the prosecution of such complaints before the Board, * * *" Section 3(d), 29 U.S.C. Sec. 153(d) (1970) (emphasis supplied). See International Union of Electrical, Radio and Machine Workers, A.F.L.-C.I.O. v. N. L. R. B., 110 U.S.App.D.C. 91, 94-95, 289 F.2d 757, 760-761 (1960). See also cases cited note 65, infra
 
 
 [66]
 Compare International Union of Electrical, Radio and Machine Workers, A.F.L.-C.I.O. v. N.L.R.B., 110 U.S.App. (1960) and N.L.R.B. v. Raytheon Co., D.C. 91, 94-95, 289 F.2d 757, 760-761 445 F.2d 272, 274 (9th Cir. 1971), with Frito Co., Western Division v. N.L.R.B., 330 F.2d 458, 465 (9th Cir. 1964) and United Packinghouse, Food and Allied Workers International Union, A.F.L.-C.I.O. v. N.L.R.B., 135 U.S.App.D.C. 111, 119 n 12, 416 F.2d 1126, 1134 n. 12, cert. denied, 396 U.S. 903, 90 S.Ct. 216, 24 L.Ed.2d 179 (1969)
 For the purposes of this case, we accept the Labor Board's assumption, due to the fact that we "must judge the propriety of [its] action solely by the grounds invoked by the agency. If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis." S.E.C. v. Chenery Corp., 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947). See Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168-169, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962).
 
 
 [67]
 Even the Association concedes that at most, the Board and Trial Examiner were only "under a duty to exercise sound discretion * * *" Brief for the Association at 16
 
 
 [68]
 See notes 65 and 66, and accompanying text, supra
 
 
 [69]
 We, of course, intend to intimate no opinion concerning the legality of a voluntary union-security provision covering a unit which includes both supervisors and rank-and-file employees. Nor do we foreclose the filing of a new charge by the Association challenging the propriety of any presently existing Company-Local 134 union-security agreement
 
 
 [1]
 The majority's assertion to the contrary notwithstanding, there is not so much as a word in the legislative history of this or any other section of the Taft-Hartley Act which indicates that Sec. 8(b)(1)(B) was intended to go further and protect supervisors from union discipline. In fact, Congress made quite clear that it had no intention to interfere with the disciplinary activity of unions against members. See, e. g., S.Rep. No. 105 on S.1126, 80th Cong., 1st Sess., 20, in 1 Legis.Hist. at 426
 
 
 [2]
 See, e. g., Iron Workers Union v. Perko, 373 U.S. 701, 708 (1963); Cheney California Lumber Co. v. NLRB, 9 Cir., 319 F.2d 375, 381 (1963); NLRB v. Puerto Rico Rayon Mills, Inc., 1 Cir., 293 F.2d 941, 947 (1961); NLRB v. Local 294, Int. Brhd of Teamsters, 2 Cir., 284 F.2d 893 (1960); NLRB v. Int. Ladies' Garment Workers Union, 3 Cir., 274 F.2d 376 (1960); Brhd of Teamsters & Auto Truck Drivers Local No. 70, 183 NLRB No. 137 (1970)
 
 
 [3]
 Thus until recently it seems to have been assumed that, while management was entitled to insist on nonunion supervisory personnel, a union was free to discipline supervisors who were union members. See, e. g., Int. Typographical Union Local 38 v. NLRB, 1 Cir., 278 F.2d 6, 12 (1960), affirmed by equally divided Court, 365 U.S. 705, 81 S.Ct. 855, 6 L.Ed.2d 36 (1961)
 
 
 [4]
 Indeed, when a union disciplines a supervisor with the specific intent of forcing management to replace him, the union's conduct falls within the core prohibition of Sec. 8(b)(1)(B). See, e. g., Dallas Mailers Union, Local 143 v. NLRB, 144 U.S.App.D.C. 254, 445 F.2d 730 (1971)
 
 
 [5]
 The Board won judicial approval of the Oakland Mailers doctrine in Dallas Mailers Union, Local No. 143 v. NLRB, supra note 4; NLRB v. Sheet Metal Workers Int. Assn., Local 49, 10 Cir., 430 F.2d 1348 (1970); and NLRB v. Toledo Locals Nos. 15-P & 272 of Lithographers, etc., Union, 6 Cir., 437 F.2d 55 (1971). The doctrine was applied without essential change in New Mexico District Council of Carpenters & Joiners and Galen R. Wilson, 176 NLRB 797 (1969); New Mexico District Council of Carpenters & Joiners and Marvin Freese, 177 NLRB 500 (1969); Houston Typographical Union No. 87, 182 NLRB 592; and Freight, Construction, General Drivers, etc. Union, Local 287, 183 NLRB No. 49 (1970)
 
 
 [6]
 Superficially, Meat Cutters migh appear similar to NLRB v. Sheet Metal Workers Int. Assn, Local 49, supra note 5. In Sheet Metal Workers the Board found a Sec. 8(b)(1)(B) violation when the union fined a supervisor for performing rank-and-file work ostensibly unrelated to his collective bargaining and grievance adjustment functions, and the 10th Circuit enforced the Board's order. However, a close examination of that case makes clear that the fine was imposed because the supervisor intrepreted the union contract in a manner which permitted him to perform the rank-and-file work. See also NLRB v. Toledo Locals Nos. 15-P & 272 of Lithographers, etc., Union, supra note 5. Contract interpretation is, of course, part of a supervisor's grievance settlement duties. In Meat Cutters no claim was made that the supervisors were engaged in their grievance settlement functions when they elected to obey the management order to institute a new meat procurement policy
 
 
 [7]
 The case would have been considerably easier if the Board had found that the supervisors were disciplined with the intent to influence their collective bargaining and grievance settlement decisions. Cf. Local Union No. 453, Brhd of Painters, Decorators & Paperhangers, 183 NLRB No. 24 (1970). But no such finding was made
 
 
 [8]
 Once before, the Board applied Sec. 8(b)(1)(B) to union fines of supervisors doing rank-and-file struck work. See Toledo Locals Nos. 15-P & 272 of Lithographers etc. Union, 175 NLRB 1072 (1969), enforced, 6 Cir., 437 F.2d 55 (1971). However, in the Toledo case the supervisors were fined for interpreting the contract in a manner which permitted them to perform the work. See 437 F.2d at 57. Since contract interpretation is clearly a part of a supervisor's normal grievance settling duties, the Toledo case is easily distinguishable. See note 6 supra
 
 
 [9]
 Although plainly reluctant to find a Sec. 8(b)(1)(B) violation, the trial examiner nevertheless felt compelled to do so because of the Board's prior decision in New Mexico District Council of Carpenters & Joiners and Galen R. Wilson, supra note 5. A close look at New Mexico District Council, however, makes clear, that that case is inapposite. The Carpenters & Joiners Union was held to have violated Sec. 8(b)(1)(B) when it disciplined a supervisor who co-signed a letter urging employees to vote with management in a union election. Obviously, it is part of a supervisor's collective bargaining duties to urge management's viewpoint on union members. The Board's holding in New Mexico District Council is therefore squarely within the Oakland Mailers rule. It is far from obvious, however, that a supervisor's ordinary duties include performance of rank-and-file work. See text at notes 10-11 infra
 
 
 [10]
 Thus, as the majority itself concedes, "'Rank-and-file work' concerns that work which is ordinarily performed by regular, non-supervisory employees in the bargaining unit." Majority op. at note 4. Inasmuch as the majority also concedes that supervisors can be fined for their non-supervisory activities, majority op. at note 28, it is difficult to understand the theory under which fines for performance of rank-and-file work are proscribed
 
 
 [11]
 It is interesting that none of the conduct for which these supervisors were punished fell within the description of supervisory functions contained in the Act. Section 2(11) of the Act, 29 U.S.C. Sec. 152(11) provides: "The term 'supervisor' means any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment." Since these "supervisors" were performing none of these functions at the time when discipline was imposed, but rather were assigned to ordinary rank-and-file work, it could be argued that they were not then supervisors within the meaning of the Act and, hence, were not within the ambit of Sec. 8(b)(1)(B)
 
 
 [12]
 On May 21, 1968, the Protective Association filed an unfair labor practice charge, No. 13-CA-8451, alleging that the company's collective bargaining contract was illegal because the union security clause required that supervisory and non-supervisory personnel be placed in the same collective bargaining unit. The General Counsel refused to prosecute the complaint, citing Nassau & Suffolk Contractors Assn, Inc., 118 NLRB 174, 177-184 (1957). See Joint Appendix at 201-202. Subsequently, the Protective Association attempted to amend its Sec. 8(b)(1)(B) complaint so as to include a similar charge against the union. See JA at 184-185. The trial examiner refused to permit the amendment, and we uphold that decision today. See majority op. at ____ _ ____ of 159 U.S.App.D.C., 1130-1132 of 487 F.2d
 
 
 [13]
 Section 8(b)(1)(A), 29 U.S.C. Sec. 158(b)(1)(A), provides, in relevant part: "It shall be an unfair labor practice for a labor organization or its agents * * * to restrain or coerce * * * employees in the exercise of the rights guaranteed in section 157 of this title * * *."
 
 
 [14]
 The proviso states: "Provided, That this paragraph shall not impair the right of a labor organization to prescribe its own rules with respect to the acquisition or retention of membership therein * *."
 
 
 [15]
 Thus the Allis-Chalmers plurality held: "It is no answer that the proviso to Sec. 8(b)(1)(A) preserves to the union the power to expel the offending member", 388 U.S. at 183, 87 S.Ct. at 2008 (emphasis added), and upheld union fines, not within the scope of the proviso, because "literal application of the imprecise words 'restrain or coerce' * * * [would produce] * * * extraordinary results * * *." Id. at 184, 87 S.Ct. at 2008
 
 
 [16]
 To support its argument that the proviso makes the Supreme Court's Allis-Chalmers decision irrelevant to Sec. 8(b)(1)(B) cases, the majority cites Gould, Some Limitations Upon Union Discipline Under the National Labor Relations Act: The Radiations of Allis-Chalmers, 1970 Duke L.J. 1067, 1128. This is what Professor Gould says to the page cited: "Of course, the existence of the proviso was not critical to the Court's conclusion in Allis-Chalmers although it did provide 'cogent support.' In Allis-Chalmers the Court was primarily concerned with an assessment of the language 'restrain or coerce'-language which is applicable to section 8(b)(1)(B) as well as section 8(b)(1)(A). Therefore, the mere failure of Congress to attach the proviso to section 8(b)(1)(B) does not establish the conclusion that a union's internal affairs are to be excluded from consideration." Interestingly, Professor Gould ultimately concludes that under Allis-Chalmers Sec. 8(b)(1)(B) does permit unions to fine supervisor-members for performance of struck work. See 1970 Duke L.J. at 1128-1129
 
 
 [17]
 The majority quotes dicta from Carpenters District Council of Milwaukee County, etc. v. NLRB, 107 U.S.App.D.C. 55, 57, 274 F.2d 564, 566 (1959), to the effect that an employer is free to discharge supervisors to prevent them from joining unions. But no one is claiming that employers have a statutory obligation to allow their supervisors to become union members. Rather, the issue in this case is whether anything in the Act prohibits a union from enforcing reasonable obligations of union membership against supervisors once the employer has decided to allow his supervisory personnel to assume union membership
 
 
 [18]
 Section 2(3), 29 U.S.C. Sec. 152(3) (1970), provides: "The term 'employee' shall include any employee * * * but shall not include any individual employed as * * * a supervisor * * *." Section 7, 29 U.S.C. Sec. 157 (1970), in turn, guarantees to "employees" only the right to form or join labor unions
 
 
 [19]
 Section 14(a), 29 U.S.C. Sec. 164(a) (1970), provides: "Nothing herein shall prohibit any individual employed as a supervisor from becoming or remaining a member of a labor organization, but no employer subject to this subchapter shall be compelled to deem individuals defined herein as supervisors as employees for the purpose of any law, either national or local, relating to collective bargaining."