486 F.2d 602
 83 L.R.R.M. (BNA) 2827, 71 Lab.Cas. P 13,815
 NATIONAL LABOR RELATIONS BOARD, Petitioner, and Wisconsin
Electric Power Company, Intervenor,
v.
LOCAL 2150, INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS,
AFL-CIO, Respondent.
 No. 71-1864.
 United States Court of Appeals,
Seventh Circuit.
 Argued Nov. 29, 1972.
Decided July 13, 1973.
Rehearing En Banc Denied Aug. 6, 1973.
 
 Marcel Mallet-Prevost, Asst. Gen. Counsel, Daniel M. Katz, Atty., N. L. R. B., Washington, D. C., for petitioner.
 Robert H. Gorske, Milwaukee, Wis. for intervenor.
 Alan M. Levy, Milwaukee, Wis., for respondent.
 Before KILEY and CUMMINGS, Circuit Judges, and ESCHBACH,[1] District Judge.
 CUMMINGS, Circuit Judge.
 
 
 1
 The National Labor Relations Board found that the Union[2] violated Section 8(b)(1)(B) of the National Labor Relations Act by disciplining certain company supervisors for performing bargaining unit work during the Union's economic strike. This case arises on the Board's application for enforcement of its order issued pursuant to that finding. The Board's decision and order are reported at 192 NLRB No. 16.
 
 
 2
 Since the 1930's the Company and the Union have enjoyed a collective bargaining relationship. When their then current two-year contract expired on June 16, 1969, the Union initiated an economic strike which continued until July 1, 1969. During the strike all the Company's supervisors in the categories of those disciplined save one, who was hospitalized at the time, reported for work. The record contains no suggestion that the Company gave the supervisors an option to choose not to cross the picket line.[3] Following the strike the Union preferred charges against 60 supervisors (including the hospitalized one) for doing struck work.[4] All but two of these were holders of union withdrawal cards. A withdrawal card entitles the holder to a very qualified union membership as explained below. After a trial at which none of the charged supervisors appeared, the Union found all guilty except for the hospitalized supervisor and one of the two who did not possess a withdrawal card. The other supervisor not retaining a withdrawal card had his discipline nullified upon appeal to the International Union. The Union imposed on each guilty supervisor a $100 fine and a year's suspension. This sentence was to be suspended on condition that the supervisors were not found guilty of a similar offense for a period of two years, which period extended beyond the expiration of the new collective bargaining agreement.
 
 
 3
 None of the supervisors here involved were members of the bargaining unit, and the Union did not represent them in bargaining with the Company. Nevertheless, the collective bargaining agreement in force prior to the strike provided that upon an employee's promotion to a supervisory position the Union would give him a withdrawal card if he so requested. Union withdrawal cards are either of the honorary or participating type. Some supervisors involved here held the former; others the latter. Both types carry an exemption for the holder from the dues obligation to the Union and entitle the holder to regain regular membership without fulfilling normal reinstatement requirements. In addition, the holder of the participating withdrawal card is entitled to participate in the pension and insurance benefits of the Union's International Affiliate upon the payment of certain fees. Withdrawal card-holders are denied all other benefits of membership including even the right to attend union meetings, but are subject to the Union's constitution.
 
 
 4
 The Board agreed with the Trial Examiner that all 60 of the concededly statutory supervisors[5] possessed the authority to adjust grievances and were representatives of the Employer within the meaning of Section 8(b)(1)(B). The Union does not contest this finding. With Member Fanning dissenting, a three-member majority of the Board panel concluded that the Union violated Section 8(b)(1)(B) when it disciplined the supervisors for crossing the picket line and performing struck work. Relying on the general principles of law defining the thrust of Section 8(b)(1)(B) as enunciated in Lithographers Locals 15-P and 272 (The Toledo Blade Co., Inc.), 175 NLRB 1072, 1080, enforced, 437 F.2d 55 (6th Cir. 1971), which principles the Board found long settled in its decisions and the courts', the Board reasoned:
 
 
 5
 "Here the supervisors, by doing struck work, as directed, by the Employer, were furthering the interests of the Employer in a dispute not between the Union and the supervisorunion members but between the Employer and the Union. During the strike of the Union, the Employer clearly considered its supervisors among those it could depend on during this period. The Union's fining of the supervisors who were acting in the Employer's interest in performing the struck work severely jeopardized the relationship between the Employer and its supervisors. Thus, the fines, if found to be lawful, would now permit the Union to drive a wedge between a supervisor and the Employer, thus interfering with the performance of the duties the Employer had a right to expect the supervisor to perform. The Employer could no longer count on the complete and undivided loyalty of those it had selected to act as its collective-bargaining agents or to act for it in adjusting grievances. Moreover, such fines clearly interfere with the Employer's control over its own representatives.
 
 
 6
 "Of course, our decision is not meant to imply that a union is completely precluded from disciplining supervisor-union members. It only means that when the underlying dispute is between the employer and the union rather than between the union and the supervisor, then the union is precluded in taking disciplinary action by Section 8(b)(1)(B). The intent is to prevent the supervisor from being placed in a position where he must decide either to support his employer and thereby risk internal union discipline or support the union and thereby jeopardize his position with the employer. To place the supervisor in such a position casts doubt both upon his loyalty to his employer and upon his effectiveness as the employer's collective-bargaining and grievance adjustment representative. The purpose of Section 8(b)(1)(B) is to assure to the employer that its selected collective-bargaining representatives will be completely faithful to its desires. This cannot be achieved if the union has an effective method, union disciplinary action, by which it can pressure such representative to deviate from the interests of the employer. Accordingly, we find that Section 8(b)(1)(B) has been violated."[6]
 
 
 7
 Section 8(b)(1)(B) of the Labor-Management Relations Act (29 U.S.C. Sec. 158(b)(1)(B)) provides: "It shall be an unfair labor practice for a labor organization or its agents * * * to restrain or coerce * * * an employer in the selection of his representatives for the purposes of collective bargaining or the adjustment of grievances." The Union raises three principal arguments against the Board's decision that discipline of supervisor-members for performing struck work for the Employer was prohibited by this Section. First, the Union urges that the Section should be interpreted literally so as only to prohibit unions from "restraining or coercing employers-not supervisors-in the selection of representatives for bargaining or grievance adjustment process." Second, it argues that even if Section 8(b)(1)(B) does prohibit union restraint or coercion against employers through the imposition of discipline on supervisor-members (who are concededly representatives of the employer) for their exercise of management responsibilities, it does not reach disciplinary action taken against these persons for their performance of struck work. Third, it contends that the Supreme Court's decision in National Labor Relations Board v. Allis-Chalmers Mfg. Co., 388 U.S. 175, 87 S.Ct. 2001, 18 L.Ed.2d 1123, demonstrates that the Union's exertion of internal discipline against any members for crossing its picket lines is not restraint or coercion within the meaning of Section 8(b)(1)(B).
 
 
 8
 Each of these arguments was raised and rejected in International Brotherhood of Electrical Workers v. National Labor Relations Board, 487 F.2d 1113 (D.C. Cir. 1972).[7] In that case also, the union disciplined supervisors who performed rank-and-file work during an economic strike. We are persuaded by much of Judge MacKinnon's reasoning and consider it largely dispositive of the arguments the Union makes on the facts of this case.[8] Although we shall not traverse in detail the same ground he has so thoroughly covered, because the panel in the District of Columbia Circuit was so sharply divided, we shall briefly respond to the Union's arguments and address what we believe to be the critical points of difference between the majority there and Judge Wright in dissent.
 
 
 9
 The Union's literal interpretation argument was squarely rejected by the Board in San Francisco-Oakland Mailers No. 18, 172 NLRB 2173 (1968). In that case the union brought charges against certain supervisor-members for alleged contract violations including the use of an assistant foreman to repair a machine and the permitting of non-union members to do bargaining unit work, and the union fined the supervisors for contempt when they failed to appear before the executive committee. In finding a violation of Section 8(b)(1)(B), the Board stated:
 
 
 10
 "* * * Respondent's actions * * * were designed to change the Charging Party's representatives from persons representing the viewpoint of management to persons responsive or subservient to Respondent's will. In enacting Section 8(b)(1)(B) Congress sought to prevent the very evil involved herein-union interference with an employer's control over its own representatives. [Footnote omitted.] That Respondent may have sought the substitution of attitudes rather than persons, and may have exerted its pressure upon the Charging Party by indirect rather than direct means, cannot alter the ultimate fact that pressure was exerted here for the purpose of interfering with the Charging Party's control over its representatives. Realistically, the Employer would have to replace its foremen or face de facto nonrepresentation by them." 172 NLRB at 2173.
 
 
 11
 Without exception the courts which have been faced with the question have interpreted Section 8(b)(1)(B) not merely to prohibit restraint or coercion directly aimed at an employer in his actual selection of his representatives but to forbid pressure against an employer accomplished indirectly by way of disciplinary action leveled against those whom the employer had selected to represent him for their conduct in performing their collective-bargaining or grievance-adjustment functions, which included contract interpretation.[9] We agree that an employer's right to select those representatives whom he chooses would be worthless if the Union could accomplish the functional equivalent of restraining or coercing him in that selection by applying pressure upon those whom the employer has already selected so as to compromise their loyalty. But, like the District of Columbia Circuit, we do not believe Section 8(b)(1)(B) can properly be confined to apply only to union discipline of an employer representative that is based upon his actions on behalf of management regarding a specific disagreement with the Union over the negotiation of a contract term or the proper interpretation of the collective bargaining agreement or the adjustment of a specific grievance. International Brotherhood of Electrical Workers v. National Labor Relations Board, supra, 487 F.2d at 1121.[10]
 
 
 12
 Because they are supervisors, an employer has a right to expect that whether they are union members or not, they will discharge their properly supervisory or managerial responsibilities in the best interests of the company. When the employer has a dispute with the union, and the union disciplines supervisors for performing their supervisory responsibilities on the employer's behalf in that dispute, that discipline "drive[s] a wedge between [the] supervisor[s] and the Employer" and may reasonably be expected to undermine the loyalty and effectiveness of these supervisors when called upon to act for the company in their representative capacities.[11] In this way the union's discipline effects a "substitution of attitudes rather than of persons" and accomplishes the functional equivalent of forcing the employer to select representatives responsive to the union's interests.
 
 
 13
 In International Brotherhood of Electrical Workers v. National Labor Relations Board, supra, the dissent did not disagree that Section 8(b)(1)(B) would reach discipline imposed on a supervisor-representative for his exercise of a properly managerial responsibility. Id., 487 F.2d at 1135-1137. However, in opposition to the panel majority, Judge Wright felt that the "performance of ordinary rank-and-file work * * * could not possibly be considered to fall within their [the supervisors'] ordinary managerial responsibilities." Id., 487 F.2d at 1135, 1136. We disagree and align ourselves more closely with the panel majority on this point.
 
 
 14
 We cannot accept the notion that supervisors who perform bargainingunit work during a strike, at least in the absence of an express option to refuse to cross the picket line, are not exercising a properly supervisory responsibility because "under normal circumstances" that work is the responsibility of rank-and-file employees. Id., 487 F.2d at 1137. What a supervisor's proper functions are when the full complement of employees is at work under the regime of a collective bargaining agreement then in force is not determinative of supervisory responsibility during a strike. Otherwise, with no employees to supervise, many supervisors would simply have no managerial responsibilities during a strike. But it can hardly be doubted that it is an essential part of the economic warfare involved in a strike for management to muster its resources in an effort to withstand the union's economic coercion. Equally undisputable, it would seem, is that an employer is not limited to combatting a strike only with his pocketbook while the business lies idle. Rather, management has "traditionally" (id.) relied upon supervisors, where practicable, to pitch in and perform rank-and-file work in an attempt both to strengthen its bargaining position and to preserve the enterprise from collapse during an adverse economic repercussion following a strike. Insofar as the supervisors work to give the employer added economic leverage, they are acting as members of the management team are expected to act when the employer and union are at loggerheads in their most fundamental of disputes. Indeed, in a real sense they are representing the employer for the purpose of collective bargaining, for "the use of economic pressure by the parties to a labor dispute * * * is part and parcel of the process of collective bargaining." National Labor Relations Board v. Insurance Agents International Union, 361 U.S. 477, 495, 80 S.Ct. 419, 430, 4 L.Ed.2d 454. Insofar as their effort helps to keep the business going in order to fulfill commitments to customers and to preserve the company's clientele and good name from deterioration, it lies at the very core of the entrepreneurial function. Assuredly here where the Company is an electric power company, holding a monopoly, its managment has an especial obligation to continue to provide an indispensable public service during a time of strike. Accordingly, we think supervisors who act in their employer's interests by performing rank-and-file work during a strike are indeed performing a properly managerial function.
 
 
 15
 Any suggestion that National Labor Relations Board v. Allis-Chalmers Mfg. Co., 388 U.S. 175, 87 S.Ct. 2001, 18 L.Ed.2d 1123, has controlling significance for this case because the words "restrain or coerce" are common to Sections 8(b)(1)(A) and 8(b)(1)(B) and because in both cases the Unions imposed fines for the performance of struck work (International Brotherhood of Electrical Workers v. National Labor Relations Board, supra, 487 F.2d at 1138-1141) must be rejected. Allis-Chalmers only considered the question whether union fines against employee-members for strikebreaking constituted an unfair labor practice under Section 8(b)(1)(A) as a restraint or coercion of those employees in the exercise of their Section 7 right to refrain from concerted activities.[12] Id. at 176, 87 S.Ct. 2001. Here the question is whether the imposition of discipline against supervisor-members for performing struck work is an unfair labor practice under Section 8(b)(1)(B) as a restraint or coercion of the employer in his right to select and retain loyal representatives. Since Sections 8(b)(1)(A) and 8(b)(1)(B) protect different interests, it simply does not follow that discipline which does not amount to restraint or coercion of the employee under the former cannot constitute restraint or coercion of the employer under the latter. The analysis of the employee-member's relationship with his union on which Allis-Chalmers is predicated is not apposite or adequate when the employer claims that the union's discipline of its members interfered with his protected relationship with his representatives.
 
 
 16
 In Allis-Chalmers the Supreme Court concluded that Congress did not intend in enacting Section 8(b)(1)(A) to regulate internal union affairs to the extent of stripping unions of the power to fine members for strikebreaking (Id. at 183, 87 S.Ct. 2001), but that says nothing about the proper reach of Section 8(b)(1)(B), by which Congress evidenced a concern to deprive the unions of power to turn the employer's representatives against him. Recently the Supreme Court has explained that the basis of its holding in Allis-Chalmers was that Section 8(b)(1)(A) was "not intended by Congress to apply to the imposition by the union of fines not affecting the employer-employee relationship and not otherwise prohibited by the Act." National Labor Relations Board v. Boeing Co., 412 U.S. 67, 73, 93 S.Ct. 1952, 1956, 36 L.Ed.2d 752. Where, as here, Congress granted express protection to the employer-representative relationship it cannot be said that Congress intended to leave the union as free to discipline its members as it did in enacting Section 8(b)(1)(A).
 
 
 17
 Accordingly, Allis-Chalmers does not control this case. To be sure the Union's interest in enforcing a rule against its members crossing picket lines must be acknowledged, but in our view its enforcement against supervisor-members who are employer representatives "impairs [a] policy Congress has imbedded in the labor laws." National Labor Relations Board v. Textile Workers, 409 U.S. 213, 216, 93 S.Ct. 385, 387, 34 L.Ed.2d 422; Scofield v. National Labor Relations Board, 394 U.S. 423, 430, 89 S.Ct. 1154, 22 L.Ed.2d 385.
 
 
 18
 The Union also argues that since the Company allowed its supervisors to retain union membership, it thus voluntarily agreed that the Union could exert its discipline over these members. Undoubtedly by permitting employees promoted to supervisory positions to retain withdrawal cards, the Company must be taken to have acquiesced in some union control over those supervisors who requested the cards. But to agree that the Company acceded to some union control hardly means that the Company waived its right to the protection of Section 8(b)(1)(B). Even where the employers have agreed to union security provisions requiring supervisors to be full union members, and they were included in the bargaining unit, no waiver of the protection of Section 8(b)(1)(B) has been found. International Brotherhood of Electrical Workers v. National Labor Relations Board, supra, 487 F.2d at 1122; Lithographers Locals 15-P and 272 (The Toledo Blade Co., Inc.), 175 NLRB 1072, 1080, enforced, 437 F.2d 55 (6th Cir. 1971); see Meat Cutters Local 81 v. National Labor Relations Board, 458 F.2d 794, 796 n.3 (D.C.Cir. 1972). Whether or not that view is correct, surely no waiver should be found here where the supervisors were not in the bargaining unit and retained only a vestigial membership status entitling them to nothing more than a waiver of reinstatement requirements and, in the case of the participating withdrawal card-holder, certain pension and insurance benefits. Indeed, the logical upshot of the Union's argument is that the Company acquiesced in any discipline the Union might impose on a supervisor for practically anything since the Union's constitution, to which the withdrawal card-holders are subject, makes it an offense to work "in the interest of any organization or cause which is detrimental to, or opposed to, the I.B.E.W."[13] Furthermore, the withdrawal card, and in turn the Company's agreement that promoted supervisors could request and retain the cards, hardly clear by their own terms, must be construed as ambulatory with respect to changes in the Union's constitution. If the Company waived the protection to which it is entitled under Section 8(b)(1)(B), that waiver must be found in clear and unmistakable terms. See National Labor Relations Board v. Wisconsin Aluminum Foundry Co., 440 F.2d 393, 399-400 (7th Cir. 1971). Since we cannot find such an expression of waiver, the measure of union control over supervisor-members in which the Company acquiesced is only that which is without the reach of Section 8(b)(1)(B).
 
 
 19
 Accordingly, the Board's order will be enforced.
 
 
 20
 KILEY, Circuit Judge (dissenting).
 
 
 21
 I respectfully dissent, for the reasons so ably and persuasively expressed by Judge Skelly Wright in writing the opinion for the District of Columbia Circuit On Rehearing En Banc in International Brotherhood of Electrical Workers, etc., et al. v. National Labor Relations Board, 487 F.2d 1143, decided June 29, 1973.
 
 
 
 [1]
 District Judge Jesse E. Eschbach of the Northern District of Indiana is sitting by designation
 
 
 [2]
 Local 2150, International Brotherhood of Electrical Workers, AFL-CIO
 
 
 [3]
 Although at oral argument before the Board company counsel asserted that the Company had instructed the supervisors to report for work and this is uncontroverted, as the Board noted, that is not explicit in the record. However, unless the Company expressly gave the supervisors an option as to whether to cross the picket lines or not, the Board's case would not be vulnerable. It is such an option which could present a problem in that if the Company left to the supervisors' discretion the decision whether to align themselves with management or with the Union, arguably it might be difficult for the Company legitimately to complain about the Union's compromising the loyalty of these representatives. But see International Brotherhood of Electrical Workers v. National Labor Relations Board, 487 F.2d 1113, 1125 (D.C.Cir. 1972). (It has also been suggested that whether the supervisors were performing a properly supervisory function might be more debatable. See id., 487 F.2d at 1137.) But this record contains not the slightest hint of the Company's giving such an option and, even if there were no direct order, is only reasonably consistent with the Company's expectation that the supervisors would report for work
 
 
 [4]
 The complaint originally involved 61 persons, but the 61st, a safety specialist, was found to be not clearly a statutory supervisor and not to be an employer representative within the coverage of Section 8(b)(1)(B)
 
 
 [5]
 See Section 2(11) of the Act (29 U.S.C. Sec. 152(11)) for the statutory definition of "supervisor."
 
 
 [6]
 Thus the Board agreed with the Trial Examiner's decision as regards those supervisors whose disciplines remained in effect but, contrary to the Trial Examiner, concluded that as regards the two supervisors against whom charges were eventually dropped and the third whose discipline was revoked on appeal, the Union had also violated Section 8(b) (1)(B). It reasoned "[t]he fact that the Union brought charges of misconduct against these supervisors is sufficient to warrant the finding of a violation."
 With regard to the Union's merely bringing charges against the one supervisor who did not possess a withdrawal card and in fining the other non-possessor of a withdrawal card, whose discipline was revoked on appeal, the restraint or coercion of the employer is not so clear. Since these supervisors had no cards, since the Union's actions against them were concededly the result of error, and since the Union professes no jurisdiction over them, it is difficult to see how the Company can reasonably be doubtful of their loyalty or how they might in fact be deterred from vigorously representing management's interests in their representative capacities. The situation may be different with respect to the hospitalized supervisor because he did retain a withdrawal card, and the Union's actions in preferring charges against him served notice on him that had he actually performed his managerial responsibility, the Union would surely have fined him. His loyalty and effectiveness in the future might be undermined. Nevertheless, the Union has not objected to the Board's treating the aborted discipline of any of these three supervisors on the same footing as the discipline of the others. Therefore, we do not actually reach the point, but do put the Board on notice that when the issue is live, the Board's conclusion as to restraint or coercion in similar circumstances will be closely scrutinized.
 
 
 [7]
 This opinion was prepared before the release of the District of Columbia's en banc opinion in International Brotherhood of Electrical Workers v. National Labor Relations Board, 487 F.2d 1143. In its en banc opinion the District of Columbia Circuit also disposed of National Labor Relations Board v. Florida Power & Light Co., wherein some of the supervisors disciplined for performing struck work were not included in the bargaining unit, were not represented by the union in bargaining, were only affiliated with the union by virtue of withdrawal cards, and were not shown to have been accorded an express option by the employer as to working during the strike. At the very least, insofar as it reaches an opposite conclusion on these facts, we disagree with the majority opinion therein and are in accord with Judge MacKinnon's dissenting opinion representing the views of himself and Judges Tamm, Robb, and Wilkey. The references herein to the International Brotherhood of Electrical Workers opinion refer to the prior panel opinion, 487 F.2d 1113 (D.C.Cir. 1972)
 
 
 [8]
 The facts in International Brotherhood of Electrical Workers v. National Labor Relations Board, supra, are different in several respects from those in this case, and, of course, we intimate no view as to whether the differences call for a different result. In that case, the disciplined supervisors were full union members, were required to be union members under the terms of the union security provision of the collective bargaining agreement, and were members of the bargaining unit. Also, at the inception of the strike, the company expressly told the supervisors that the decision whether or not to respect the picket lines was up to the discretion of each individual foreman
 
 
 [9]
 Dallas Mailers Local 143 v. National Labor Relations Board, 144 U.S.App.D.C. 254, 445 F.2d 730 (1971); National Labor Relations Board v. Lithographers Local Nos. 15-P and 272, 437 F.2d 55 (6th Cir. 1971); National Labor Relations Board v. Sheet Metal Workers Local 49, 430 F.2d 1348 (10th Cir. 1970)
 
 
 [10]
 See Meat Cutters Local 81 v. National Labor Relations Board, 458 F.2d 794 (D.C.Cir. 1972) (discipline of supervisor-grievance adjustment representative for carrying out management's order to implement new meat procurement policy); National Labor Relations Board v. New Mexico Dist. Coun. of Carpenters, 454 F.2d 1116 (10th Cir. 1972) (discipline of supervisor-representative for working for an employer who was not making payments into the union's health and welfare fund and who had no working agreement with the union; discipline of supervisor-grievance adjustment representative for co-signing letter urging employees to vote against the union in an upcoming election)
 
 
 [11]
 As the Sixth Circuit stated in a case where supervisors were fined for performing struck work in alleged derogation of the collective bargaining agreement, "[t]his conduct of the union would further operate to make the employees reluctant in the future to take a position adverse to the union, and their usefulness to their employer would thereby be impaired." National Labor Relations Board v. Lithographers Locals Nos. 15-P and 272, 437 F.2d 55, 57 (6th Cir. 1971). And in Meat Cutters Local 81 v. National Labor Relations Board, 458 F.2d 794, 799 (D.C.Cir. 1972), where the union disciplined a supervisor for implementing the employer's new meat procurement policy, the Court stated, "* * * there would have been serious doubt thereafter as to whether he could represent the Company in a bona fide manner against the Union in other matters where their interests were adverse."
 
 
 [12]
 Section 8(b)(1)(A) (29 U.S.C. Sec. 158 (b)(1)(A)) provides:
 "It shall be an unfair labor practice for a labor organization or its agents * * * to restrain or coerce * * * employees in the exercise of the rights guaranteed in section : Provided, That this paragraph shall not impair the right of a labor organization to prescribe its own rules with respect to the acquisition or retention of membership therein * * *."
 Section 7 (29 U.S.C. Sec. 157) provides in pertinent part:
 "Employees shall have the right to * * * engage in * * * concerted activities * * *, and shall also have the right to refrain from any or all of such activities * * *."
 
 
 [13]
 International Brotherhood of Electrical Workers Constitution, Article XXVII, Section 1(10)